UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 04-11939-JGD

|  |  |
|---|---|
| MICHAEL J. WHALON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CHRISTY'S OF CAPE COD, LLC, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT CHRISTY'S OF CAPE COD, LLC'S CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1, Defendant Christy's of Cape Cod, LLC ("Christy's") submits the following concise statement of material facts:

1.      Christy's of Cape Cod, LLC, comprises a chain of approximately ten (10) convenience stores located in and around Cape Cod, Massachusetts. (One store is located in Marion Massachusetts). The current entity, Christy's of Cape Cod, LLC, was created on May 4, 1998, following the sale of much larger, predecessor entity known as Christy's Markets, Inc., which consisted of approximately 147 stores. The smaller entity, which is the Defendant in this action, has been in simultaneous operation since May 4, 1998. (Deposition of Patrick McKeown ("McKeown Depo."), Vol 1, pp. 15-16). (Attached hereto as Tab #1).

2.      Since May 1998, Patrick J. McKeown, ("McKeown"), has served as the

Executive Vice President and Chief Operating Officer of Christy's of Cape Cod. In this role he is responsible for overall management of the company, including: real estate transactions, office administration, lease negotiations, human resources, gasoline distributing, gasoline purchasing, environmental compliance and guidelines, insurance, and real estate management. In this role, Mr. McKeown also supervises the Controller and District Manager of Christy's. (McKeown Depo., Vol 1, pp. 15-17). (Tab #1).

3.      From May 1998 through February 2002, Plaintiff Michael J. Whalon, ("Whalon") served as Marketing Counselor for Christy's. In this role he was responsible for daily operations at the ten stores, including three food service locations. (McKeown Depo. Vol 1, pp. 24-28) (Tab #1).

4.      As the Marketing Counselor (also known as "Marketing Coordinator" or "Marketing Supervisor"), Whalon's duties consisted of the direct and personal oversight of all Christy's store locations, including but not limited to issues relating to: staffing; orientation and training; adherence to and enforcement of company policies; rules, regulations and procedures; supervision of store management; store operations; marketing; inventory; shrinkage; cash accounting and bank deposits; PLU system operations; and any and all other tasks assigned to him or necessary for the operation of Christy's store locations. Mr. Whalon was also responsible for understanding and following policies as set forth in the Christy's of Cape Cod Policy Manual. At all times during the course of his employment, Mr. Whalon reported directly to Mr. McKeown. (McKeown Depo. Vol 1, pp. 24-29) (Tab #1); Answer # 4 to Defendant Christy's of Cape Cod LLC's Answers to Plaintiff Michael J. Whalon's First Set of Interrogatories, (hereinafter "Christy's Answers to Whalon's Interrogatories") (Tab # 2). During his

2

deposition, Mr. Whalon acknowledged that these job duties included responsibility for cash and auditing, as well as responsibility for understanding and enforcing the Policies of Christy's. (Whalon Depo., Vol 1, 98-103, 105-115, 126-129) (Tab #3).

5.      In November 2001, Mr. McKeown was contacted by Kristina DeCosta, Manager of one of the Christy's convenience stores, concerning irregularities relating to a $500 money order, which was lacking proper backup in the store's records. Upon investigation with the outside vendor/processor, Mr. McKeown learned that the money order bore the signature of the Assistant Store Manager. Ms. DeCosta also reported to Mr. McKeown that "she was uncomfortable dealing with" Mr. Whalon as her supervisor, and that "[s]he felt he was not paying enough attention to the operations of the location, particularly the cash shortages and the money order shortage." (McKeown Depo., Vol 1, pp. 43-46) (Tab # 1).

6.      Following his conversations with Ms. DeCosta, and during the approximate period of December 2001 to February 2002, Mr. McKeown initiated a larger-scale investigation of the record-keeping and financial management practices at various store locations, under Mr. Whalon's supervision, including but not limited to Ms. DeCosta's store. As a result of this investigation, Mr. McKeown identified a large number of irregularities at a number of store locations with respect to cash accounting, inventory, bank deposits and general record-keeping. (McKeown Depo., Vol 1, pp. 46-47) (Tab # 1).

7.      As part of this ongoing investigation, multiple documents summarizing the irregularities were prepared, along with supporting "backup" paperwork. See generally McKeown Depo., Vol 1, pp. 46-47) (Tab # 1). Specifically, Mr. McKeown testified

3

during his deposition regarding a document captioned "Performance Analysis" detailing seven (7) specific issues occurring between October 2001 and January 2001. This document was identified as Exhibit 3B during McKeown's deposition, and is attached hereto at Tab # 4. (McKeown Depo., Vol. 1, pp. 37-38) (Tab # 1). Mr. McKeown testified during his two-day deposition in extensive detail as to the various transactions identified on the "Performance Analysis," and his underlying investigation of same. (McKeown Depo., Vol 1, pp. 46-47) (Tab 1).

8.      In aid of his deposition testimony, Mr. McKeown referred to a large stack of paperwork, presented to him as Exhibit 4 at his deposition, which comprised the paperwork "back-up" for the events detailed on the "Performance Analysis" (Exhibit 3B and Tab #4 hereto). He further testified that the top two pages of the stack (Exhibit 4) represent another summary document, prepared by Christy's Accounting Manager, and dated 1/30/02. A copy of that summary is attached hereto at Tab # 5. Mr. McKeown testified that not only did Exhibit 4 provide the "backup" for the irregularities detailed on the "Performance Analysis" (Exhibit 3B), but that, in fact, the summary prepared by the Accounting Manager may include additional irregularities not included in the "Performance Analysis." (McKeown Depo., Vol 1, pp. 55-58) (Tab # 1).

9.      As a result of his investigation, as detailed in paragraphs 5-8 above, at 2 p.m. on February 22, 2002, Mr. McKeown called Mr. Whalon to a meeting in his office to discuss payroll and "shrink" at a number of store locations. (McKeown Depo., Vol 1, p. 35) (Tab # 1). During his deposition, Mr. McKeown explained that "shrink" is a term referring to loss of company assets, inventory or cash. (McKeown Depo., Vol 1, pp. 35-36) (Tab # 1). During the February 22, 2002 meeting, Mr. McKeown discussed specific

facts regarding the irregularities noted at a number of stores (at least five) under Mr. Whalon's control. (McKeown Depo., Vol 1, p. 36) (Tab # 1).

10.    Mr. McKeown and Mr. Whalon met on February 22, 2002 from approximately 2:00 p.m. to 4:30 p.m.[1]  Immediately following the conclusion of the meeting, Mr. McKeown prepared handwritten notes which were authenticated and marked as Exhibit 5 during his deposition. They are attached hereto at Tab # 6. (See also Volume 2 of McKeown Depo. at pp. 8-13, where McKeown reads his notes into record) (Tab # 7).  In these notes, Mr. McKeown details both the specific shortages and other performance issues he discussed with Mr. Whalon, as well as Mr. Whalon's response. In conducting this meeting, Mr. McKeown testified that he and Mr. Whalon worked off of the "Performance Analysis" document discussed in paragraphs 7 and 8 above, and attached hereto at Tab # 4. Mr. McKeown noted that Mr. Whalon responded that he was unaware of the shortages and wanted to "investigate them." He further notes that, denying a suggestion by Mr. Whalon that he was accusing him of theft, Mr. McKeown responded that he was concerned that Mr. Whalon didn't think the deposits and shortages were strange and that he "had at least failed to do his job" which was, first and foremost, to get money to the bank." In another situation, Mr. Whalon claimed that he "forgot" to follow-up regarding a questionable bank deposit. (McKeown Depo., Vol 2, pp. 5-15, 17-18, 39, 64-65) (Tab # 7).

---

[1]    As detailed during Mr. McKeown's deposition, a third person, the Controller of Christy's, was present at the meeting and also apparently took contemporaneous notes. (McKeown Depo., Vol 2, pp. 56-58) (Tab # 7).

As the meeting drew to a close, noting that Mr. Whalon had failed to notice or investigate numerous questionable transactions on his watch, Mr. McKeown relayed the following exchange during his deposition:

> He asked me where all this was going. I relied that he failed to perform his job. I require the very basics of performance, getting sales rung in and deposits to the bank. ***I told him I was inclined to terminate him***.

(McKeown Depo., Vol. 2 at p. 12) (Tab # 7). (Emphasis supplied). As the meeting concluded, Mr. McKeown suspended Mr. Whalon until Thursday, February 25, 2002, pending further investigation and consultation with the owner of Christy's. (McKeown Depo., Vol 2, pp. 5-15, 38-39) (Tab #7). Mr. McKeown provided Mr. Whalon with the Performance Notice Form, (attached hereto as Tab # 8). This document, dated 2/22/02 states under the "Action to be Taken" for Mr. Whalon "Suspension and/or Termination." (McKeown Depo, Vol. 2, pp. 38-39) (Tab # 7).

11.    During his deposition, Mr. Whalon testified regarding the February 22, 2002 meeting, and acknowledged multiple times that Mr. McKeown clearly communicated to him that he "was going to terminate me" but "suspended me instead." (Whalon Depo., Vol. 1, pp. 132-141) (Tab # 3); (Whalon Depo., Vol. 2, pp. 136-37, 140-41) (Tab # 9).

12.    Mr. McKeown testified that between February 22 and February 27, 2002 he made the decision to terminate Mr. Whalon's employment. This decision was made in consultation with legal counsel and the owner of Christy's of Cape Cod, LLC, and was informed by his total investigation, including further investigation undertaken during Mr. Whalon's suspension. (McKeown Depo, Vol. 2, pp. 41-43, 49-51, 67-69) (Tab # 9).

6

The decision was based upon, inter alia, "[h]ighly irregular changes of grand totals and documentation." (McKeown Depo, Vol. 2, pp. 41-43) (Tab # 9). See also Answer # 11 to Christy's Answers to Whalon's Interrogatories) (Tab # 2).[2][3]

13.    Mr. McKeown testified at his deposition that the discipline imposed on Mr. Whalon was not unique. Other employees, including managers, have been disciplined and terminated for similar misconduct and/or negligence." (McKeown Depo, Vol. 2, pp. 47-48) (Tab # 7).

14.    Mr. McKeown testified unequivocally at his deposition that, prior to the meeting on February 27, 2002, he had no knowledge that Mr. Whalon suffered from any mental health problems whatsoever. (McKeown Depo, Vol. 2, pp. 18-19) (Tab # 7). From 1998 through that date and time, Mr. Whalon may have communicated with Mr. McKeown concerning physical injuries or conditions relating to his ankle, back and/or jaw. (Answer No. 16 to Christy's Answers to Whalon's Interrogatories") (Tab # 2). It was not until February 28, 2002 when Mr. McKeown received note via facsimile from the Bethel Medical Group stating: "Michael has been evaluated with anxiety and chest pain and may not return to work until March 13, 02" that he first learned Mr. Whalon may have suffered from any alleged mental/emotional health issues. (McKeown Depo, Vol. 2, pp. 31-32) (Tab # 7). The note from Bethel Medical Group is attached hereto at

---

[2]    "Plaintiff's employment was terminated following [Christy's] discovery of significant accounting, cash management, and inventory irregularities at Christy's stores under Mr. Whalon's supervision. Investigation detailed that Mr. Whalon was personally involved in some of the irregular transactions, including but not limited to bank deposits. When questioned by Mr. McKeown about these events, Mr. Whalon's responses indicated that he was failing to provide proper oversight for store operations; and/or that [he] was failing to follow, enforce, and/or monitor compliance with Christy's policies and procedures"

[3]    It should also be noted that during his deposition, Mr. McKeown stated that he held no opinion as to whether Mr. Whalon or any of the store managers were personally involved in any "misappropriation of funds" from Christy's. (McKeown Depo, Vol. 2, pp. 44-45) (Tab # 7).

Tab #10. During his first day of deposition, Mr. Whalon testified that he saw the doctor "the next day," but upon further questioning did not dispute the date of February 27, 2002 on the document. Mr. Whalon testified that he obtained and faxed the note to Mr. McKeown following that doctor's appointment. (Whalon Depo., Vol 1, pp. 149, 152-54). (Tab #3). During his second day of deposition, Mr. Whalon now asserted (without explanation) that the note had been misdated, but could not conclusively state when he had seen Dr. Gilson. He noted that he personally faxed it to Mr. McKeown, and conceded that he had not previously sent any such notes to Mr. McKeown. (Whalon Depo., Vol 2., pp. 61-70) (Tab # 9).

15.    When questioned during his deposition, Mr. Whalon indicated that he started treatment for bipolar disorder with Anne Kronenberg, RNCS, in 2000. (Whalon Depo., Vol 2, pp. 5-6, 9-13, 22) (Tab #9). He repeatedly answered that he "did not recall" when asked if he ever told Mr. McKeown about any mental health or emotional issues prior to February 27, 2002. He was similarly unable to recall if he had taken any time off from work to attend any appointments related to such treatments. (Whalon Depo., Vol 1, pp. 175-76, 191-92) (Tab # 3). During his second day of deposition, Mr. Whalon indicated that he hadn't previously told Mr. McKeown, that the only way Christy's would have known he was receiving such care was when he had medical appointments, and that the only people he remembers telling about these appointments were Jean, the Office Manager, (whom he allegedly told he was going to the "counselor") and Rich Price, the Controller (whom he allegedly told he was going to the "cukoo doctor"). Mr. Whalon identified both individuals as his friends, not his supervisors, in the context of such comments. By the conclusion of the deposition, Mr. Whalon

conceded that he had not previously told Mr. McKeown of such treatment. (Whalon Depo., Vol 2, pp. 52-60, 67, 70, 75-76) (Tab #9).

16.    On March 4, 2002, Christy's, through McKeown, sent correspondence to Mr. Whalon referencing the February 22, 2002 meeting and noting that "we were inclined to end your employment at that time." (Exhibit 9 at McKeown's deposition). The letter further states that Whalon "urged me [McKeown] to give further consideration to the matter" and that Whalon was, therefore, "placed on suspension pending further investigation in consideration as to whether or not there are any facts to mitigate [McKeown's] previous determination how to proceed." The correspondence notes that Christy's has further reviewed the facts, and would like to meet with Whalon to discuss the findings and determinations. Recognizing that Whalon had requested a sick leave during the suspension, the letter indicates that the meeting will take place when Whalon is available or upon his return to work on March 13, 2002. (McKeown Depo, Vol. 2, pp. 31-43) (Tab # 7). Quoted correspondence is attached hereto at Tab # 11.

17.    Thereafter, on March 7, 2002, Mr. McKeown received a second medical note, dated March 6, 2002, (Exhibit 7 at McKeown's deposition), this time from Anne Kronenberg, RNCS of the Charis Counseling Centers. This note stated that: "Michael is out of work due to extreme anxiety, panic attacks and severe depression – he will return to work April 1, 02." (McKeown Depo, Vol. 2, pp. 40-41) (Tab # 7). The note from Ms. Kronenberg is attached hereto at Tab # 12. Noting the writing across the top of the document, it indicates that Mr. Whalon faxed it from the O'Keefe-Wade Funeral Home at 6:08 PM on Mar. 07 2002. See Tab # 12.

18.     Whalon did not return to work on March 13, 2002. Rather, a second note was received from Anne Kronenberg, dated March 21, 2002, (Exhibit 12 at McKeown's Deposition), asking Christy's to excuse Mr. Whalon from work until May 4, 2002, with no stated medical reason. (McKeown Depo, Vol. 2, p. 53) (Tab # 7). The note from Ms. Kronenberg is attached hereto at Tab # 13.

19.     Notwithstanding the note referenced in paragraph 18 above, Mr. Whalon did appear at Christy's on March 27, 2002 and was terminated at that time. (McKeown Depo, Vol. 2, p. 49-51) (Tab # 7). He was provided with a Performance Notice to that effect, bearing dual dates of February 25, 2002 and March 27, 2002. Mr. Whalon refused to sign the document. A copy of the Performance Notice is attached hereto at Tab # 14.

20.     Subsequent to Mr. Whalon's termination, and in response to Mr. Whalon seeking further leave, Mr. McKeown sent further correspondence to Mr. Whalon. A copy of that correspondence, dated April 12, 2002, is attached hereto. That letter again notes that: (1) Whalon was informed of Christy's intention to terminate his employment on February 22, 2002; (2) that he was placed on suspension pending further investigation; (3) that further investigation did not produce mitigating evidence; rather, it revealed additional inconsistencies; and (4) that, subsequent to a period of leave and extension of leave for claimed health problems, Mr. Whalon's employment was terminated on March 27, 2002. A copy of this correspondence is attached hereto at Tab # 15.

21.     During his deposition, Mr. Whalon testified regarding his employment history, both before and after Christy's. He testified that prior to Christy's, he worked for a restaurant in a variety of positions, a trucking/warehouse company, and two funeral homes. (His work with funeral homes occurred before, during, and after his period of

employment at Christy's). Following Christy's, he has worked in retail (CVS and
Cumberland Farms) as well performing warehouse work through a temporary agency.
(Whalon Depo., Vol. 1, pp. 17-54, 57-64) (Tab # 3). Mr. Whalon indicated that he is able
to perform his current maintenance position satisfactorily. Apart from a professed
inability to work in jobs involving cash and accounting, which Mr. Whalon alleges
caused him to quit his job at CVS and be terminated from his position at Cumberland
Farms (both manager training programs), Mr. Whalon reported that he is and has been
able to perform all other jobs satisfactorily, including his current position. Id. See also
Whalon Depo., Vol. 1, pp. 75-76. (Tab # 3) Mr. Whalon also testified that prior to
working for Defendant starting in 1998, he worked for several years for the predecessor
company, Christy's Markets, Inc., in a variety of positions and with success. (Whalon
Depo., Vol 1, pp. 87-91) (Tab # 3). At the time of his employment with Defendant
Christy's of Cape Cod, LLC, Mr. Whalon completed an "Employee Questionnaire" on
which he answered "No" when asked: "Is there any reason why you would be limited in
the performance of any of the tasks listed above, or why their performance would lead to
the risk of injury to yourself, to others or to property?" See Tab #16, attached hereto.
During his second day of deposition, although Mr. Whalon made reference to his
condition affecting him "jobwise," in positions where he had to work with others, he
nonetheless agreed that he had been able to perform his duties at Christy's. (Whalon
Depo., Vol 2, pp. 43-44) (Tab # 9).

      22.    During his first day of deposition, Mr. Whalon was questioned extensively
on the impact of his alleged disability on his life. Apart from a professed inability to
work in positions accounting for cash, and a claim that he would occasionally suffer

"anxiety attacks" while working on household finances with his spouse, Mr. Whalon did

not identify that he suffers from any substantial impairment of a major life activity.

Indeed, he appeared to be as active as he chooses, (fishing, softball, spending time with

his family), limited only by certain temporary physical ailments such as a back, ankle and

jaw pain/injuries and migraines. (Whalon Depo., Vol 1, pp. 76-91) (Tab # 3) (Whalon

Depo., Vol 2 pp. 11-12) (Tab # 9). During his second day of deposition, he testified

simply that he would "get depressed" have "outbursts" and panic attacks. He testified

that the condition could, at times, strain his marriage. (Whalon Depo., Vol 2, pp. 40-48,

50-51) (Tab #9). Physically, he failed to identify any impact apart from blurred vision.

He noted no effect on speaking, movement or reproduction. (Whalon Depo., Vol 2, pp.

49-51) (Tab #9).

      23.    During the course of discovery in this case, the parties deposed Lydmila

Rakita, M.D., who treated Mr. Whalon for medical evaluation and medication

management between March 2002 and April 2005. (Rakita Depo., pp. 12-13, 57) (Tab

#17). Accordingly, Dr. Rakita did not treat – nor had she met – Mr. Whalon prior to the

alleged adverse employment action in this case. Dr. Rakita testified to a number of Mr.

Whalon's symptoms during her course of treatment, but did not identify any substantial

impairment of a major life activity. (Rakita Depo., p. 18) (Tab #17). Based upon her

assessment of symptoms and medical history, Dr. Rakita testified that she diagnosed Mr.

Whalon as suffering from bipolar disorder, dating to his childhood. (Rakita Depo., pp.

19, 45-46) (Tab # 17). Dr. Rakita testified that in completing a disability form she once

indicated Mr. Whalon had "difficulty holding a job," based upon his report to her, but

that did not know the circumstances or details, apart from his report that he was "not able to stay at work for [a] decent period of time." (Rakita Depo., p. 23) (Tab # 17).

24.    During the course of discovery in this case, the parties deposed Ethan Kisch, M.D., who treated Mr. Whalon for the purpose of psychopharmacology from May 2005 through December 1, 2005. (Kisch Depo., pp. 29, 36-37, 64-65) (Tab # 18). Accordingly, Dr. Kisch did not treat – nor had he met – Mr. Whalon prior to the alleged adverse employment action in this case.[4] Dr. Kisch testified to Mr. Whalon's bipolar disorder, with shared symptoms of Obsessive Compulsive Disorder and possible hypothyrodism as a result of taking prescription medications. (Kisch Depo., pp 39-42) (Tab #18). Dr. Kisch testified that he believed Mr. Whalon's bipolar disorder was caused by familial or genetic sources. (Kisch Depo., pp 140) (Tab #18). Dr. Kisch did not identify any substantial impairment of a major life activity. With respect to employment, Dr. Kisch testified that he did not find "major occupational difficulty" during an evaluation in September 2005 – despite Whalon's report of multiple job changes at the outset of treatment – and that he did not recall any specific information relating to multiple job changes for Mr. Whalon. (Kisch Depo., pp 126-128) (Tab #18). Ultimately, Dr. Kisch testified that he could not provide information about any occupational difficulties Whalon may have been having during treatment, or any (or how many) jobs he may have held during their brief period of treatment. (Kisch Depo., pp 170-71) (Tab #18).

---

[4]    Dr. Kisch testified that he had treated Mr. Whalon prior to May 2005 at another facility and that, due to an absence of records, he could not furnish exact dates of treatment but guessed it was "a year or two" earlier – still after the alleged adverse employment action in this case. (Kisch Depo., pp. 28-29) (Tab # 18).

25.     During the course of discovery in this case, the parties deposed Anne
Kronenberg, RNCS, who provided mental health counseling for Mr. Whalon from 2000
through the present. (Kronenberg Depo., p. 19) (Tab # 19).  Notably, she testified that
prior to February 2002 she determined that Mr. Whalon was "totally negative" in her
assessment of bipolar disorder, and that she instead believed he suffered from possibly
post-traumatic stress disorder, generalized anxiety disorder, obsessive compulsive
disorder and/or panic attacks. (Kronenberg Depo., pp. 44, 46, 55-56, 60-61, 62-64) (Tab
# 19).  Ms. Kronenberg testified that Mr. Whalon's bipolar disorder was caused by "the
trauma of feeling betrayed by being fired from Christy's and falsely accused."
(Kronenberg Depo., pp. 105-108) (Tab # 19).[5]  She further testified that she wrote the
March 6, 2006 note excusing him from work (Tab # 12), as is her custom when she
believes a patient is "too upset" to work.  (Kronenberg Depo., pp. 79-80) (Tab # 19).
Interestingly, she noted that she does not recall (nor do her notes reflect) discussing
employment with Mr. Whalon on either February 28, 2002 or March 6, 2002.
(Kronenberg Depo., p. 81) (Tab # 19).  She testified that she wrote the March 21, 2002
note (Tab # 13) because he was having "flashbacks" relating to his termination by Mr.
McKeown.  (Kronenberg Depo., p. 86-87) (Tab # 19).[6]  With respect to employment, Ms.
Kronenberg noted that from October 2000 to January 2002, Mr. Whalon did not express
difficulty with work.  (Kronenberg Depo., p. 68) (Tab # 19).  She further testified that,

---

[5]     As support for this opinion – disputed by both Drs. Rakita and Kisch (see Rakita Depo.,
p. 46 (Tab # 17); Kish Depo., p. 141, 161-63 (Tab # 18), Ms. Kronenberg cites to the experience of her
child whom, she believes, developed bipolar disorder after being traumatized in a Mexican jail and falsely
accused.  (Kronenberg Depo., p. 106) (Tab # 19).

[6]     Ms. Kronenberg also testified that she authored a letter to Plaintiff's Counsel, dated
September 12, 2002, at Mr. Whalon's request, in which she again opined that Defendant's conduct caused
Mr. Whalon's existing mental health problems to "exacerbate into" bipolar disorder.  (Kronenberg Depo.,
pp. .115-116) (Tab # 19).

subsequent to Mr. Whalon's termination from Christy's it is her opinion that he "cannot work in any store where he has to touch the cash flow." (Kronenberg Depo., p. 101) (Tab # 19). Finally, Ms. Kronenberg testified that she does not know if Mr. Whalon told anyone at Christy's that he believed he suffered from mental health conditions, but noted that she did think he discussed his mental health condition with anyone other than physicians. (Kronenberg Depo., p. 115) (Tab # 19).

Respectfully submitted.

DEFENDANT CHRISTY'S OF CAPE COD, LLC

By its attorney,

/s/ Thomas W. Colomb
Thomas W. Colomb, BBO # 638211
tcolomb@mhtl.com
Murphy, Hesse, Toomey & Lehane, LLP
300 Crown Colony Drive, Suite 410
P.O. Box 9126
Quincy, MA  02169-9126
(617) 479-5000

Dated:        August 11, 2006