# TAB 1

1

```
 1                              Volume I
                                Pages 1 to 104
 2                              Exhibits (See Index)

 3              UNITED STATES DISTRICT COURT

 4              DISTRICT OF MASSACHUSETTS

 5     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
       MICHAEL J. WHALON,
 6                    Plaintiff(s),

 7          v.                        Civil Action
                                      No. 04-11939-JGD
 8     CHRISTY'S OF CAPE COD, LLC,
                    Defendant(s).
 9     _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10

11          DEPOSITION OF PATRICK MCKEOWN, a witness called

12     by counsel for the Plaintiff, taken pursuant to the

13     applicable rules, before Diane L. McElwee, Registered

14     Merit Reporter and Notary Public in and for the

15     Commonwealth of Massachusetts, at the Law Offices of

16     DAVID O. SCOTT, P.C., 200 Chauncy Street, Mansfield,

17     Massachusetts, on Tuesday, November 8, 2005,

18     commencing at 11:55 AM.

19

20

21             _____

22              DIANE L. McELWEE, RPR, RMR
                   152 Seekonk Street
23              Norfolk, Massachusetts 02056
                Tel. and Fax -- 508-528-1055
24              e-mail -- dlmdepos@yahoo.com
```

1    time?

2        A    Christy Milhos and his brother.  They both

3    owned the company.  I believe Christy was a

4    51 percent owner and his brother was 49.

5        Q    What, if anything, happened to your career

6    on May 3, 1998?

7        A    On May 4th Christy's Markets, Inc., sold to

8    Southland Corporation all of the stores.  There was

9    147 I believe at the time, close to.  Then Christy

10   Milhos purchased ten stores back from Southland and

11   created Christy's of Cape Cod, LLC.

12       Q    Were those ten stores all located

13   geographically on or near Cape Cod?

14       A    Nine of them were on Cape Cod.  One was in

15   Marion, Massachusetts.

16       Q    On May 4th, when this corporate restructure

17   occurred, how did that affect your position?

18       A    I went to work for the new company as an

19   executive vice president and chief operating officer.

20       Q    How long did you stay in that position?

21       A    I am currently in that position.

22       Q    Has your job title changed from 1998 to the

23   present?

24       A    No.

1    Q    Has the scope of your responsibilities

2  changed from May 4, 1998 to the present?

3    A    Yes.

4    Q    In what way?

5    A    As a smaller company you are required to do

6  more functions because you don't have the support.

7  So now I am involved in real estate transactions,

8  office administration, lease negotiation, human

9  resources, gasoline distributing, gasoline

10  purchasing, environmental compliance and guidelines,

11  insurance, and real estate management.

12    Q    Are there any other V.P.'s in the

13  restructured organization that you now work for that

14  you are aware of?

15    A    No.

16    Q    Do you report directly to Mr. Milhos?

17    A    Yes, I do.

18    Q    Do you directly supervise any employees?

19    A    Yes, I do.

20    Q    What employees do you directly supervise in

21  terms of position?

22    A    Christine Downey would be the controller,

23  Chris, D O W N E Y; Ken Camille, C A M I L L E, he is

24  the district manager.

1    Q    Any other direct reports as we sit here

2    today?

3    A    No.

4    Q    During your employment with Christy's

5    Marketing, were you required to attend any type of

6    management training education programs, seminars to

7    obtain additional skills relative to the services

8    that you were performing for Christy's Marketing?

9              MR. COLOMB:  Excuse me.  Do you mean

10   to say Christy's Markets, Inc.?

11             MR. SCOTT:  Yes.

12   A    I went to some merchandising classes,

13   category management classes, computer tutorials.

14   That's all I recall.

15   Q    Regarding your employment with Christy's of

16   Cape Cod, LLC, did you ever attend as a condition of

17   your employment any similar education programs as my

18   previous question?

19   A    Not that I recall.

20   Q    Did you become at any time aware of an

21   employee named Michael Whalon?

22   A    Could you be more specific?

23   Q    Sure.

24             Was there a time during your employment

1   supervisor up to the reorganization date of May 4,

2   1998; is that correct?

3       A    That's my understanding.

4       Q    After that date did his position change?

5       A    When he came to work for Christy's of

6   Cape Cod it changed.

7       Q    Did he start to work for Christy's of Cape

8   Cod, if you know, right as you did, right after the

9   change-over or the reorganization?

10      A    I am pretty sure.

11      Q    And do you know what position he held when

12  he came over to Christy's of Cape Cod, LLC?

13      A    Marketing counselor.

14      Q    I would like to show you a document and ask

15  if you can identify it.

16      A    Yes, I have seen that document.

17      Q    Is the document that I have placed before

18  you the Answers of Christy's of Cape Cod, LLC, to

19  Plaintiff's First Set of Interrogatories?

20      A    I believe so.

21      Q    Referring you to the second-to-the-last page

22  of this 12-page document, is that a copy of your

23  signature on page 11?

24      A    Yes, it is.

1              MR. SCOTT:  We will mark this copy.

2         (Exhibit 1 marked for identification)

3      Q    Did you hire Mr. Whalon as the marketing

4  coordinator?

5      A    Marketing coordinator or counselor.

6      Q    You are not sure what the exact title was?

7      A    I think the title changed on the business

8  cards.

9      Q    Were the duties the same in either position,

10  either title?

11     A    Yes.

12     Q    So for the sake of this deposition, just to

13  keep things simple, if I refer to the marketing

14  coordinator or the marketing supervisor, I am

15  referring to the position that Michael Whalon held

16  after the reorganization.  Was Mr. Whalon the

17  marketing coordinator after the reorganization for

18  all of the remaining stores or the buy-back stores?

19  I believe you said there were ten.

20     A    Yes, he was.

21     Q    Did the change-over from food service

22  supervisor to marketing coordinator involve a greater

23  scope of responsibilities from one position to the

24  other?

1      A      I don't know how you define "greater."

2      Q      More diverse functions.

3      A      You could say that.  He also continued to do

4  food service because we had three food service

5  stores.

6      Q      Could you tell me what you mean by a "food

7  service store"?

8      A      Taco Bell.  We would operate a Taco Bell

9  mini express inside one of our convenience stores.

10     Q      Were these food service stores within these

11 ten stores bought back by Christy's of Cape Cod, LLC?

12     A      Correct.

13     Q      Was Taco Bell the only food service that was

14 part of the ten-store reconfiguration after the

15 change-over?

16     A      That's an ambiguous question.

17     Q      I will withdraw that question and ask

18 another question.

19            In terms of Mike Whalon's food service

20 supervisor responsibilities, were there any other

21 stores other than those three Taco Bell stores that

22 he had food service responsibilities for?

23     A      No.  Can we clarify "food service

24 responsibilities"?  Can I explain to you why it's a

1    little ambiguous to me?

2        Q    Please.

3        A    We had three Taco Bell operations that we

4    actually operated.  After 1998 we solicited Dunkin

5    Donuts to put satellite operations in our stores, but

6    it was a lease situation.  We were not operating

7    those food service entities.

8            So the question you asked me is a

9    little bit ambiguous, because if for some reason that

10   Dunkin Donuts didn't open on a certain day, Michael

11   would have to call me and tell me so I could notify

12   Dunkin Donuts.  I am not saying that ever happened,

13   but the question was --

14       Q    I understand.

15           I would like to refer you to

16   Interrogatory No. 4 and the answer in No. 4 on page 3

17   of Exhibit 1.  Take a minute to look at that and let

18   me know that you have done so.

19           (Pause)

20       Q    Is the answer to Interrogatory No. 4 a fair

21   summary of Mr. Whalon's responsibilities as a

22   marketing coordinator?

23       A    I stated previously that the job function of

24   myself changed in terms of responsibilities.  Are

1    these all the responsibilities of Michael?  I am sure

2    there was more that changed on a daily basis.  I am

3    not comfortable saying this is all the

4    responsibilities that he had, because I might have

5    left one out.

6        Q    As you sit here today are these the

7    responsibilities that you can think of that he had?

8    Nothing else comes to your mind?

9                 MR. COLOMB:  Objection.  You can

10   answer the question.

11       A    The food service obviously.

12       Q    Other than the things that you have listed

13   here, plus the food service supervisory function, are

14   there any other functions of Mr. Whalon's employment

15   that come to your mind as you sit here today?

16       A    Not that I recall.

17       Q    What training or education did the company

18   provide to Mr. Whalon, if you know, regarding the

19   position that he held as the marketing coordinator?

20       A    On-the-job training.  I believe he got

21   computer training.  That's all that I recall right

22   now.

23       Q    When you say computer training, do you

24   recall any specific programs or courses that he

1    attended?

2        A    Not that I can recall right now.

3        Q    Do you have any recall of the length or

4    duration of any of these computer training events?

5        A    No.

6        Q    At some point during his employment with

7    Christy's of Cape Cod, LLC, did Mr. Whalon ever

8    directly report to you as his direct supervisor?

9        A    Yes, he did report to me.

10        Q    From what point in time did he report to you

11    directly?

12        A    From the day he was employed with Christy's

13    of Cape Cod, LLC.

14        Q    Do you know whether that date of employment

15    was May 4, 1998?

16        A    I believe it was.

17        Q    I would like you to take a look, if you

18    would, at Interrogatory No. 6 and answer to No. 6 on

19    page 4.

20        (Pause)

21        Q    Could you describe any of the various

22    seminars that are referred to in the answer to No. 6

23    in term of when they occurred, where they occurred,

24    scope of the seminar, the title of the seminar, who

1              A F T E R N O O N   S E S S I O N

2

3                DIRECT EXAMINATION, resumed

4    BY MR. SCOTT:

5         Q    At some point in your employment experience

6    with Mr. Whalon were you involved in any type of

7    discipline of him as an employee?

8         A    Prior to February 22d?

9         Q    Let's say prior to the fall of 2001.

10        A    Not that I am aware of.

11        Q    What about after the fall of 2001?

12        A    February 22d.

13        Q    What happened on February 22d?

14        A    I called Michael to come into a meeting

15   between he and I at two o'clock on February 22d to

16   discuss payroll and shrink in a number of locations.

17        Q    When you say February 22d, are you referring

18   to February 22, 2002?

19        A    Correct.

20        Q    Could you explain what you mean by -- I

21   believe the term you used was "payroll and shrink."

22        A    We had a store manager's opening position

23   available at Store 610 that I needed to discuss with

24   him, and then I had some shrink, meaning losses to

1   the company's assets, in a number of stores. I

2   believe the stores we discussed were 602, 607, and

3   612, and then later in the conversation we discussed

4   specific incidents in Store 608 and Store 610.

5      Q   And did you provide Mr. Whalon at that

6   meeting with the specific facts regarding the issues

7   in those stores, in other words, the amounts of

8   shrinkage in each store or whatever the factual basis

9   was for your conclusions?

10      A   Which store?

11      Q   Any of the stores involved in that

12   discussion.

13      A   Yes, I did.

14      Q   And did you provide that orally, or did you

15   give him some written documents that would have

16   reflected these issues?

17      A   I provided written documents that he was

18   able to view.

19      Q   And what, if anything, was his response to

20   your comments?

21      A   Well, there was a number of issues

22   discussed. Could you be more specific?

23      Q   Let's take them one at a time. I will let

24   you choose which one first.

1    A    The first issue we discussed, maybe an hour

2    or 45 minutes into the conversation, the first issue

3    we discussed was a money order.  I believe it was on

4    10/29/01 for $500.

5    Q    I am sorry.  Could I get the amount again?

6    A    500.

7    Q    Was it a money order that issued from a

8    store?

9    A    Store 608.

10    Q    And what was the issue relative to Store 608

11    and this money order?

12    A    There was no backup detail provided to the

13    office on why that was paid out.

14    Q    And what was his response to that issue, if

15    any?

16    A    He would look into it.

17    Q    Did you discuss any other issues with him

18    that day?

19    A    We discussed a miscellaneous paid out for

20    $576 I believe for the same store.

21         MR. SCOTT:  Off the record.

22         (Discussion off the record)

23    Q    I know I have partially answered the

24    question I have given you in an off-the-record

1    discussion between counsel.  I am going to introduce

2    a document to show you and see if you can identify

3    it.  It consists of two pages.  Have you seen that

4    document before?

5        A    Yes, I have.

6        Q    And did you take a look at the second page

7    to make sure you can also identify the second page?

8        A    I believe I recognize that.

9        Q    Going back to the question that I asked you

10   previously -- let's get this marked.

11             (Exhibits 3A and 3B marked for

12              identification)

13       Q    3A is a document entitled, "Performance

14   Notice," and 3B is a document entitled, "Performance

15   Analysis," is that correct, in terms of the headings?

16       A    Correct.

17       Q    You were telling me before this document

18   about some issues that you discussed with Mr. Whalon

19   at a meeting on February 22, 2002, and you told me

20   about a money order at Store 608 that there was an

21   issue with, and then I think you were starting to

22   tell me about a second issue.  So would you proceed.

23       A    There was a second issue regarding a

24   miscellanous paid out for $576 and change that I was

1          Can you describe the discussions you

2    had with Christina DeCosta relative to the

3    information represented on Exhibit 3B?

4          A    Yes.

5          Q    Can you tell me what the nature of the

6    discussion was, what you said to her and what she

7    said to you?

8          A    I received a phone call from Christina

9    DeCosta in November 2001 regarding an issue about a

10   money order which is listed on Exhibit 3B, No. 1, and

11   she said she would like me to meet her and discuss

12   the situation outside of the store.

13         Q    Did you in fact do that?

14         A    Yes, I did.

15         Q    What was the discussion that you had with

16   her about Item No. 1 on Exhibit 3B?

17         A    The discussion related to the fact that the

18   money order was for $500, and it had no backup

19   information to substantiate the $500 payout.

20              So the next thing I did was I contacted

21   or had contact with First Data, which is the money

22   order company, parent company, and I requested a copy

23   of the money order.

24         Q    Did you receive a copy of the money order?

1     A    Yes, I did.

2     Q    Did that help you to determine what happened

3    regarding that situation?

4     A    No.  It caused me to do further

5    investigation because Dori Caussey's -- the assistant

6    manager that was floating between two stores --

7    signature was on the money order.

8     Q    Can you spell Dori's last name?

9     A    C A U S S E Y.

10    Q    Thank you.

11    A    D O R I.

12    Q    What, if anything, did you do after you

13   obtained a copy of the money order with Dori

14   Caussey's signature on it?

15    A    I asked Christine Downey to review the

16   records to see if there was any backup detail for

17   that day.

18    Q    Was there?

19    A    No.

20    Q    What, if anything, did you do next regarding

21   Item No. 1 on Exhibit 3B?

22    A    I think I requested from First Data a number

23   of similar dollar values that were from the same

24   store from American Express.

1     Q   Did they provide any such documents?

2     A   Yes.

3     Q   What, if anything, did you do after you

4  received those documents?

5     A   I reviewed them, and I believe Dori

6  Caussey's name was not on those documents I believe.

7  There were some questionable money orders but not

8  that I could attribute to an employee.

9         So then we started reviewing paperwork

10  at the store.  I believe I got a further call from

11  the store manager, Store 608, regarding certain

12  issues that she felt uncomfortable dealing with her

13  supervisor.

14     Q   Who was her supervisor?

15     A   Michael Whalon.

16     Q   Did she express to you why she felt

17  uncomfortable dealing with Michael Whalon about those

18  issues?

19     A   She felt that he was not paying close

20  attention to the operations of the location,

21  particularly the cash shortages and the money order

22  shortage.

23     Q   What, if anything, did you do after you had

24  that discussion with her?

1    A    I told her it was a serious accusation and

2    that Michael had worked for me for a considerable

3    amount of time and I believed him to be a good

4    employee and that I would have to review other

5    issues, if she had any to discuss with me, and

6    monitor the situation.

7    Q    Now did you bring any of this situation to

8    the attention of Mr. Whalon in 2001?

9    A    No.

10                MR. SCOTT:  Can we take a break.

11          (Short recess taken)

12          (Record read)

13    Q    Why not?

14    A    I felt I had to further investigate a number

15    of issues.

16    Q    What, if anything, did you do to further

17    investigate?

18    A    Reviewed more documents at the office, found

19    further discrepancies.

20    Q    And are those discrepancies recited on

21    Exhibit 3B?

22    A    To the best of my knowledge they are.

23    Q    Are there any other discrepancies that you

24    found that are not listed on Exhibit 3B?

1    A    I would have to review documents.

2    Q    So as you sit here today, you are not sure

3  if this is an exhaustive list of the discrepancies

4  that you found, referring to Exhibit 3B?

5    A    This is a one-page document.  There is quite

6  a bit of detail to back up this document.

7    Q    I am not inquiring as to the backup

8  documentation.  I am inquiring -- there are seven

9  shortages, as the document reads, listed on

10  Exhibit 3B.  I am simply asking are there any other

11  shortages or discrepancies that you found during your

12  investigation that are not listed on Exhibit 3B?

13    A    To the best of my knowledge this is what I

14  discussed with Michael at the February 22d meeting.

15    Q    If there had been other discrepancies, would

16  you have included them in this, if you knew about

17  them prior to the meeting, included them in this list

18  to discuss with Mr. Whalon?

19              MR. COLOMB:  Objection.  You can

20  answer.

21    A    Yes.

22    Q    Did you ever have a discussion with

23  Ms. Caussey regarding the money order for $500 which

24  had her signature on it?

55

1    Q    Did you tell him not to investigate or words

2    to that effect?

3    A    At the 22d meeting I told him not to

4    investigate.

5    Q    What was the reason you told him not to

6    investigate, just so we are clear?

7    A    I believe it was a conflict of interest for

8    him.

9    Q    Because it involved Store 608?

10              MR. COLOMB:  Objection.

11    A    Correct.

12    Q    What was the conflict of interest that you

13    believe might have been present?

14    A    I would have to look at the paperwork,

15    because some of these deposits are signed off by

16    Michael Whalon, so I am not sure as I sit here which

17    ones are.  I would have to take a look at the

18    paperwork to accurately answer that.

19              MR. SCOTT:  Off the record.

20         (Discussion off the record)

21    Q    I am going to hand you some documents that

22    are affixed by a clasp.  They are not necessarily

23    documents that originally were compiled in this way,

24    but at this juncture I will have you look at the

1    entire packet and ask if you can identify the

2    documents contained in that grouping.

3        A    Relative to this (indicating)?

4        Q    Just have you ever seen those before?  Do

5    you know what they are?

6            (Pause)

7        Q    At this point in time you don't need to look

8    at these.  I am asking you if you have seen the

9    packet before, and then we will relate them to

10   questions.

11              MR. COLOMB:  You will be given an

12   opportunity to look at them in whatever detail.

13       A    Yes, I believe I have seen that package.

14              MR. COLOMB:  Off the record.

15           (Discussion off the record)

16              MR. SCOTT:  Would you mark the whole

17   packet.

18           (Exhibit 4 marked for identification)

19       Q    I am going to hand you what's been marked as

20   Exhibit 4, which is a grouping of documents affixed

21   by a clasp, and just ask you some general questions

22   about this packet.

23              The first document appears to be a

24   typed document.  I think it's a couple of pages.  It

1    might be two pages.  The rest of the documents appear

2    to be some type of business records or company

3    documents that are prepared, let's say, in the normal

4    course of business.

5                  Is that a fair representation of what

6    Exhibit 4 represents?

7        A    That's a fair representation.

8        Q    Regarding the first two pages, which are the

9    typed documents, do you know who prepared that

10   document or provided the input for it?

11       A    Yes, I do.

12       Q    Was it yourself?

13       A    Christine Downing.

14       Q    Is her title CFO?

15       A    No, controller, accounting manager,

16   controller.

17       Q    What does this packet represent?  It appears

18   to relate to Exhibit 3B.  Is there any tie-in between

19   those two?

20                  MR. COLOMB:  Objection.  You can

21   answer that.

22       Q    In terms of the information.

23       A    There is, but I think there is excess

24   information in here (indicating) that's not in here

1    (indicating).

2                   MR. COLOMB:  Can the record reflect

3    when he said "in here" he is referring to Packet 4

4    and "not in here" referring to Document 3B, just so

5    we know what the "here's" are for the record.

6      Q     To your knowledge does Exhibit 4, the

7    documents contained in Exhibit 4 provide so-called

8    backup or company records which would support the

9    statements contained or the discrepancies on

10   Exhibit 3B?

11     A     To the best of my knowledge they do, but I

12   have not gone through all this to correlate between

13   the two.

14     Q     I believe -- and I am just going to continue

15   to go with the flow -- we are talking about No. 2,

16   and you said if you could see the deposit slip or the

17   transaction slip -- I forget what term you used -- a

18   document that had a signature on it, it would help

19   you to better answer the reason why you didn't want

20   Mr. Whalon to investigate.  I am going to ask you to

21   look at Exhibit 4 and see if you can find that

22   document.

23                   MR. COLOMB:  Object to the

24   characterization for the record, but please do what