# TAB 3

1

Volume:  I
Pages:  1 - 196
Exhibits:  16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 04-11939JGD

MICHAEL J. WHALON,                    )
    Plaintiff,                        )
                                      )
v.                                    )
                                      )
CHRISTY'S OF CAPE COD, LLC,           )
    Defendant.                        )

DEPOSITION of **MICHAEL J. WHALON**, a witness called on

behalf of the Defendant, taken pursuant to the

applicable provisions of the Massachusetts Rules of

Civil procedure, before John F. Kielty, a Notary

Public in and for the Commonwealth of Massachusetts,

at the Law Offices of Murphy, Hesse, Toomey &

Lehane, 300 Crown Colony Drive, Quincy,

Massachusetts, on Wednesday, September 7, 2005,

commencing at 10:25 a.m.

**JOHN F. KIELTY**
2 Garrett Place
Plymouth, Massachusetts 02360
(508) 759-6767

1     whatever you need.

2              MR. COLOMB:  Okay.

3              MR. SCOTT:  Just let me know.

4              MR. COLOMB:  Excellent.

5              Thank you.

6     BY MR. COLOMB:

7     Q.      Other than your lawsuit against Christy's,

8     which we are discussing today --

9     A.      Uh-huh.  (Indicates affirmatively).

10    Q.      -- and this personal injury case with Mr.

11    Whalon that we just spoke about, have you been

12    involved in any other court cases?

13    A.      Not that I can recall.

14    Q.      Now, you graduated high school in 1985?

15    A.      Correct.

16    Q.      Did you go to work after graduating high

17    school?

18    A.      I was working, yes.

19    Q.      Do you know where you went to work after

20    graduating high school?

21    A.      A couple of different outfits I was working

22    for, Benjamin's Restaurants, Hallsmith Sysco.

23              THE REPORTER:  I'm sorry?

24              THE WITNESS:  Hallsmith Sysco.

```
1       BY MR. COLOMB:

2       Q.      Were you working for Benjamin's Restaurant

3       and Hallsmith Sysco at the same time?

4       A.      Left one, went to the other.

5       Q.      Which place did you --

6       A.      I left Benjamin's --

7       Q.      -- work first?

8       A.      -- went to Hallsmith Sysco.

9       Q.      Was Benjamin's the first job you held after

10      high school?

11      A.      Yes.

12      Q.      And how long did you work at Benjamin's?

13      A.      I don't recall the exact dates offhand.

14      Q.      Well, what type of work did you do at

15      Benjamin's?

16      A.      A variety of jobs there, dishwasher, fry

17      cook.

18      Q.      And I know this, but just so the record is

19      clear, where is Benjamin's located.

20      A.      In Taunton.

21      Q.      Actually, a very good restaurant.

22      A.      Yeah.

23      Q.      Do you recall the name of your supervisor

24      while you were working at Benjamin's?
```

1    A.        Peter Sirroca (phonetic).  Don't ask me to

2    spell it, because I can't help you with that.

3    Q.        And can you briefly tell us what the

4    physical requirements were for the jobs that you

5    performed?

6    A.        Just standing, lifting dishes, standing over

7    a frialator, cooking, pretty much.

8    Q.        Were you involved in serving any of the

9    patrons at the restaurant?

10   A.        Yes.

11   Q.        So I am guessing you would be walking

12   between the tables and the kitchen?  Would that --

13   A.        Correct.

14   Q.        -- be a fair guess?  What types of objects

15   were you lifting?

16   A.        Trays, plates, forks, knives.

17   Q.        And were you able to perform this work?

18   A.        Yes.

19   Q.        Did you ever experience any injuries working

20   at Benjamin's?

21   A.        No, not that I recall.

22   Q.        And just so I am clear, when I am asking you

23   that question, I am including both physical injuries

24   and also mental or psychological injuries.

1    A.      Not that I can recall.

2    Q.      Do you recall when you left your employment

3    with Benjamin's?

4    A.      I'm not sure of the exact date of when I

5    left them.  I was working, again, at Hallsmith

6    Sysco.  From there, I went to Hallsmith Sysco.

7    Q.      So what was your reason for leaving

8    Benjamin's?

9    A.      Just a better opportunity.

10   Q.      Did you leave voluntarily?

11   A.      Yes.

12   Q.      What did you to for Hallsmith Sysco?

13   A.      Warehouse.

14   Q.      And where is Hallsmith Sysco located?

15   A.      Norton, Mass.

16   Q.      What type of business do they perform?

17   A.      Food service.

18   Q.      And what type of work did you do in the

19   warehouse?

20   A.      Loading trucks, product.

21   Q.      Were you physically carrying objects and

22   loading them into trucks, or did you use forklifts,

23   pallet jacks?

24   A.      A little of both.

1      Q.     Some of both.  And were you able to perform

2     the physical requirements of that job?

3     A.     Yes.

4     Q.     Did you suffer any injuries working at

5     Hallsmith Sysco?

6     A.     I did.

7     Q.     What type of injury did you suffer?

8     A.     A back injury.

9     Q.     What was the nature of the back injury?

10    A.     A ruptured disk.

11    Q.     Did you receive treatment for the ruptured

12    disk?

13    A.     Yes.

14    Q.     What type of treatment did you receive?

15    A.     Physical therapy and eventually operation.

16    Q.     Do you know the date of this injury?

17    A.     I don't recall the exact date.

18    Q.     Do you recall the date of the surgery?

19    A.     I do not.

20    Q.     Did you file a workers' compensation claim

21    for this injury?

22    A.     Yes.

23    Q.     What happened with that claim?

24    A.     It was an open workman's comp claim.

1    Q.      Was it approved --

2    A.      Yes.

3    Q.      -- at some point?

4    A.      Yeah.

5    Q.      And you did receive some amount of

6    compensation --

7    A.      Correct.

8    Q.      -- under that claim?  And at some point that

9    claim was closed?

10   A.      Correct.

11   Q.      Did you suffer any other injuries working at

12   Hallsmith Sysco?

13   A.      No.

14   Q.      Did you suffer any mental injuries or

15   psychological injuries while working at Hallsmith

16   Sysco?

17   A.      No.

18   Q.      Do you remember the name of your supervisor

19   at Hallsmith Sysco?

20   A.      There was a couple of them, Ray Schiffer

21   (phonetic).

22   Q.      Any others that --

23   A.      Do you need the rest?

24   Q.      -- you recall?  If you can recall, please.

```
 1    A.      John Castro.

 2    Q.      Are there more?

 3    A.      No.

 4    Q.      And do you recall the date that you left

 5    Hallsmith Sysco?

 6    A.      I don't offhand, no.

 7    Q.      What was the reason that you stopped working

 8    at Hallsmith Sysco?

 9    A.      Again, there was another opportunity to do

10    something else.

11    Q.      So after the back injury and having surgery,

12    did you return to Hallsmith Sysco and work for some

13    period of time?

14    A.      No.

15    Q.      Was your employment terminated by Hallsmith

16    Sysco?

17    A.      No.

18    Q.      You left voluntarily?

19    A.      It was again closed.

20    Q.      What was "closed"?

21    A.      Just the employment was closed.

22    Q.      Well, I am guessing one or the other of you

23    decided to end the relationship, either you or the

24    employer?
```

1    A.    I believe it was mutual between the employer

2    and myself.

3    Q.    What was the reason for this mutual

4    termination?

5    A.    I couldn't speculate what their -- I didn't

6    discuss anything with them.

7    Q.    What was your reason?

8    A.    Again, it was a closed matter with them, so

9    the employment did end.

10         THE REPORTER:  I'm sorry?

11         THE WITNESS:  It was a closed matter, and it

12    was the employment ended.

13    BY MR. COLOMB:

14    Q.    Did they at any time tell you that you were

15    fired?

16    A.    No.

17    Q.    When your employment ended with Hallsmith

18    Sysco, were you immediately employed somewhere

19    else, or were you unemployed for some period of

20    time?

21    A.    I don't recall the exact dates, but I

22    did -- I did start with Christy's of Cape Cod -- I'm

23    sorry, of Brockton.

24    Q.    Before starting at Christy's of Brockton,

1    had you applied for unemployment?

2    A.      No.

3    Q.      Do you know how long you had been out of

4    work before you started with Christy's of Brockton?

5    A.      I don't know.

6            MR. COLOMB:  And actually, I will just state

7    for benefit of the record that I am sort of adopting

8    your model of "Christy's of Brockton," as contrasted

9    with "Christy's of Cape Cod," but I'm not entirely

10   sure myself that that is a proper corporate entity.

11   But just for the ease of discussion, I know what you

12   are referring to, the Christy's before it became a

13   different company and became the present Christy's

14   of Cape Cod.

15           So just for ease, for the record, I just

16   want to note that.

17   BY MR. COLOMB:

18   Q.      Let me ask you this, Mr. Whalon.  Before you

19   started working for Christy's, had you worked for

20   any employers other than Benjamin's Restaurant,

21   Sysco, -- I guess that is it.  For any --

22   A.      Yes.

23   Q.      For any employer other than those two

24   employers?

1    A.      Yes.

2    Q.      What other employers had you worked for?

3    A.      O'Keefe-Wade Funeral Home.

4    Q.      Where is this funeral home located?

5    A.      In Taunton, Mass.

6    Q.      When did you work there?

7    A.      Right -- pretty much part time.

8    Q.      Did you work part time for them while you

9    were in high school?

10    A.      A little bit, yes.

11    Q.      Did you work part time for the funeral home

12    while you were working at Benjamin's?

13    A.      Yes.

14    Q.      Did you work part time for the funeral home

15    while you were working at Sysco?

16    A.      Yes.

17    Q.      And did you work part time for the funeral

18    home after leaving Sysco?

19    A.      Yes.

20    Q.      Did you work part time for the funeral home

21    once you started employment with Christy's?

22    A.      Yes.

23    Q.      What type of work did you perform at the

24    O'Keefe funeral home?

1    A.        Dress man.

2    Q.        What does that mean?

3    A.        You take care of the bodies.

4    Q.        Do you have any training or education for

5    this?

6    A.        No.

7    Q.        Is there training, a formal training or

8    education program available for that function?

9    A.        I'm sure there is.

10   Q.        And do you hold any license to perform that

11   function?

12   A.        No.

13   Q.        And I assume you don't require a license to

14   do that?

15   A.        No.

16   Q.        Have you performed any other jobs at O'Keefe

17   funeral home?

18   A.        Just pretty much the dress man.

19   Q.        And what are the physical demands of that

20   job?

21   A.        Lifting the casket.

22   Q.        And do you know how much a casket would

23   weigh?

24   A.        Not offhand.  It all depends.

1   Q.      Obviously, I am sure whether it is empty or

2   in use, right?

3   A.      (Witness indicating.)

4   Q.      How did you come to work at O'Keefe funeral

5   home?

6   A.      Through my brother.

7   Q.      Can you explain that connection?

8   A.      Meaning?

9   Q.      Oh, does that mean your brother already

10  worked there?

11  A.      Yes.

12  Q.      Is this your brother Brad?

13  A.      No.

14  Q.      Another brother.  What is this brother's

15  name?

16  A.      Jeff.

17  Q.      What does Jeff do at the funeral home?

18  A.      He was an apprentice.

19  Q.      Does that mean an apprentice funeral

20  director?

21  A.      Right.

22  Q.      Do you know who owns the O'Keefe funeral

23  home?

24  A.      Yes.

1 Q. Who is that?

2 A. Billy Wade.

3 Q. Are you related to Mr. Wade?

4 A. No.

5 Q. Did you suffer any injuries while working at

6 the O'Keefe funeral home?

7 A. No.

8 Q. Did you suffer any mental or psychological

9 injuries or trauma while working at the funeral

10 home?

11 A. Not that I can recall.

12 Q. Did you work at the O'Keefe funeral home

13 throughout your employment at Christy's?

14 A. Yes.

15 Q. And approximately how often would you work

16 at the O'Keefe funeral home?

17 A. On call.

18 Q. Was there any set number of hours that you

19 worked?

20 A. Again, it was on call.

21 Q. So you weren't guaranteed any number of

22 hours?

23 A. (Indicates negatively).

24 Q. It --

1    A.      No.

2    Q.      -- would vary?  Did you pay taxes on the

3    wages that you received from O'Keefe funeral home?

4    A.      Didn't earn enough to working in there.

5    Q.      Now, just looking at my list, it appears

6    from the number of other employers that you were

7    with that you would have been at O'Keefe funeral

8    home for many years; is that right?

9    A.      Off and on on call.

10   Q.      Right.  But in none of those years did you

11   earn enough money to have to report it for taxes?

12   A.      No.

13   Q.      After your employment ended with Christy's

14   in February of 2002, did you continue to work with

15   O'Keefe funeral home?

16   A.      Yes.

17   Q.      And how often did you work with O'Keefe

18   funeral home after leaving Christy's?

19   A.      No, didn't work at all, couldn't give you

20   exact dates, times.

21   Q.      At some point did you resume working at

22   O'Keefe funeral home?

23   A.      No.  Again, it was an on call.

24   Q.      Just so I am clear on this, you have not

1    worked at O'Keefe funeral home since February of

2    2002?

3    A.    Oh, I have.  I don't know the exact dates.

4    Q.    Well, let's see if we can work it this way.

5    Do you currently work at O'Keefe funeral home?

6    A.    On call.

7    Q.    And did you work in an on-call capacity in

8    2004 at O'Keefe funeral home?

9    A.    Again, it's an on call.

10   Q.    But the answer is, yes, you did?

11   A.    It's on call.

12   Q.    I understand that it is on call, but you

13   performed some on-call work in 2004 at O'Keefe

14   funeral home?

15   A.    If I was called.

16   Q.    You don't even know necessarily that you --

17   A.    I don't believe that --

18   Q.     -- were called in 2004?

19   A.    -- what I did in -- for them that particular

20   year.  I don't.

21   Q.    Do you know if you worked for them in 2003?

22   A.    Again, it was an on call.  I don't recall

23   the exact times.

24   Q.    Do you maintain any records that indicate

1    when you work at O'Keefe funeral home?

2    A.        I don't recall any.

3    Q.        When you did work at O'Keefe funeral home or

4    do work at O'Keefe funeral home, when you perform an

5    on-call service, do you fill out a time sheet,

6    submit a time card, or some other device that

7    indicates how many hours you have worked?

8    A.        No.

9    Q.        So how are you compensated for this work at

10   O'Keefe funeral home?

11   A.        As they call it a -- I don't know, a

12   contract or however they want to term it.

13   Q.        How do they determine the amount that they

14   are going to pay you?

15   A.        Set fee by them.

16   Q.        And the "set fee" is based on hours worked,

17   days worked, --

18   A.        I couldn't --

19   Q.        -- bodies dressed?

20   A.        I have -- don't recall any conversation with

21   the owner on that.

22   Q.        Well, have you ever received a check from

23   O'Keefe funeral home?

24   A.        I have.

1    Q.    And have you ever questioned the amount of

2    that check?

3    A.    Not that I can recall.

4    Q.    Have the amount of those checks varied?

5    A.    Yes.

6    Q.    And do you know why they varied from one

7    check to another?

8    A.    I believe it was either different

9    situations, what I needed to do or didn't do.

10    Q.    So there is no agreement with O'Keefe

11    funeral home as to what rate of pay you received for

12    your services?

13    A.    No.

14        MR. SCOTT:    Could we go off the record for a

15    second?

16        MR. COLOMB:    Sure.

17        (Discussion off the record.)

18        MR. COLOMB:    Why don't we go back on?    In an

19    off-the-record conversation with Attorney Scott, we

20    discussed avenues where I may be able to obtain

21    information on the dates of the witness's employment

22    at O'Keefe funeral home, as well as the compensation

23    received, and I will continue those discussions with

24    Attorney Scott or potentially pursue other means as

1    appropriate.  So I will suspend those questions at

2    this time.

3    BY MR. COLOMB:

4    Q.       I will ask you this, though, Mr. Whalon.  Do

5    you still work for O'Keefe funeral home in an

6    on-call capacity?

7    A.       On call.

8    Q.       When was the last time you were called to

9    perform work for O'Keefe funeral home?

10   A.       Again, I don't know the exact dates at all.

11   Q.       Do you have any recollection if it was in

12   this year, 2005?

13   A.       I couldn't speculate on it.

14   Q.       Other than Benjamin's Restaurant, Sysco,

15   Christy's, and the O'Keefe funeral home, have you

16   held any other jobs since graduating high school?

17   A.       Yes.

18   Q.       What other jobs have you held?

19   A.       Conley Funeral Home.

20   Q.       Where is the Conley Funeral Home located?

21   A.       In Brockton.

22   Q.       When did you work for the Conley Funeral

23   Home?

24   A.       I'm not sure of the exact date, somewhere

1    from '99.

2    Q.    Do you still work for Conley Funeral Home?

3    A.    No.

4    Q.    When was the last time you worked for Conley

5    Funeral Home?

6    A.    Roughly, a year ago.

7    Q.    What type of work did you perform for Conley

8    Funeral Home?

9    A.    Dress man.

10   Q.    Let me ask you this.  Is there any

11   relationship between the O'Keefe funeral home and

12   the Conley Funeral Home?

13   A.    No.

14   Q.    They are independent businesses, as far as

15   you know?

16   A.    Yes.

17   Q.    Who was your supervisor at the Conley

18   Funeral Home?

19   A.    Anne Roan.

20   Q.    I'm sorry?  I didn't hear that.

21   A.    Anne Roan.

22   Q.    And what is Ms. Roan's job at the funeral

23   home?

24   A.    She's the director.

1    Q.      Just to save us the time of the questions

2    and answers, would it be fair to say that the

3    physical requirements for the dress man position at

4    the Conley Funeral Home were similar to those at the

5    O'Keefe funeral home, it is the same work?

6    A.      Yes.

7    Q.      Did you suffer any injuries while working at

8    Conley Funeral Home?

9    A.      No.

10   Q.      Did you suffer any mental or psychological

11   injuries or trauma while working at the Conley

12   Funeral Home?

13   A.      No.

14   Q.      Why did you stop working at the Conley

15   Funeral Home?

16   A.      Doesn't seem to fit in to what I'm doing.

17   Q.      What is it that you are doing?  When you say

18   it doesn't seem to fit in to with what you are

19   doing, what is it that you are doing?

20   A.      Building maintenance.

21   Q.      Was your employment terminated by Conley

22   Funeral Home?

23   A.      No.

24   Q.      Did you leave voluntarily?

```
1    A.      No, I haven't -- again, on call, if needed.
2    Q.      So it is your understanding that they could
3    at some point call you if needed --
4    A.      Correct.
5    Q.      -- at this time?  Have you held other jobs
6    up through 2002 that we haven't yet discussed?  I am
7    not asking about jobs after Christy's, but through
8    the conclusion of your employment at Christy's, have
9    you held any other jobs that we haven't discussed
10   this morning?
11   A.      Not that I recall.
12   Q.      How did you come to work at Conley Funeral
13   Home, by the way?
14   A.      Through my brother.
15   Q.      The same brother?
16   A.      Correct.
17   Q.      And he also worked at Conley Funeral Home?
18   A.      Right.
19   Q.      Now, your employment with Christy's ended in
20   February of 2002; is that right?
21   A.      I don't recall the exact date.
22   Q.      Have you been employed after your job at
23   Christy's ended?  Have you held other jobs since
24   your employment at Christy's ended?
```

1    A.    Yes.

2    Q.    What was the first job that you held after

3    leaving Christy's?

4    A.    CVS Pharmacy.

5    Q.    Did you work at a particular CVS store?

6    A.    Yes.

7    Q.    What store was that?

8    A.    Their Taunton store.

9    Q.    What job did you hold at CVS in Taunton?

10   A.    Manager in training.

11   Q.    Did you hold any other positions at the CVS,

12   other than manager in training?

13   A.    No.

14   Q.    When did you hold this job?

15   A.    I don't recall the exact dates.

16   Q.    Do you recall how long after your employment

17   ended with Christy's?

18   A.    I don't recall.

19   Q.    Do you know when your employment with CVS

20   ended?

21   A.    The exact date, it was in August.

22   Q.    Do you know the year?

23   A.    I don't recall.

24   Q.    Do you know how many months or how many

1       years you had worked at CVS?

2       A.      Exactly, no.

3       Q.      Do you know if it was more than one year?

4       A.      I don't.

5       Q.      What did you do as a manager in training?

6       A.      Learned the CVS -- ran their business.

7       Q.      Was there a formal training program?

8       A.      Yes.

9       Q.      Where did that take place?

10      A.      Right in their store.

11      Q.      Who was your supervisor when you were

12      working at CVS?

13      A.      Kevin.  I believe it's O'Keefe.

14      Q.      And do you know what Kevin O'Keefe's title

15      was?

16      A.      I think supervisor.  I'm not sure of his

17      exact title.

18      Q.      Was Mr. O'Keefe assigned to the Taunton

19      store?

20      A.      I believe he was.

21      Q.      At some point did you become a manager at

22      CVS?

23      A.      No.

24      Q.      Why did you not become a manager at CVS?

```
 1   A.        Wasn't -- didn't work out.

 2   Q.        Did CVS terminate your employment?

 3   A.        No.

 4   Q.        Did you leave CVS voluntarily?

 5   A.        Yes.

 6   Q.        Had you been told that you were going to be

 7   terminated?

 8   A.        Not that I can recall.

 9   Q.        Had you been told that you were not going to

10   be selected as a manager?

11   A.        Not that I can recall, no.

12   Q.        So when you say it didn't work out, what

13   didn't work out at CVS?

14   A.        The ability to perform what they were

15   looking for.

16   Q.        And how did you learn that you were unable

17   to perform what they were looking for?

18   A.        I was talked to.

19   Q.        Who told you this?

20   A.        Supervisor.

21   Q.        That would be Mr. O'Keefe?

22   A.        Right.

23   Q.        What were the physical demands of the

24   manager-in-training job?
```

1    A.      Lifting products, stocking their shelves.

2    Q.      Anything else?

3    A.      Their paperwork.

4    Q.      Did you suffer any injuries while working at

5    CVS?

6    A.      Not that I can recall.

7    Q.      Did you suffer any mental or psychological

8    injuries or trauma while working at CVS?

9    A.      I already had.

10   Q.      Can you tell me about your relationship with

11   Mr. O'Keefe?

12   A.      Other than a supervisor, nothing.

13   Q.      Did you like Mr. O'Keefe?

14   A.      He was a supervisor.

15   Q.      Well, I understand he was your supervisor,

16   but what I am asking is this.  Did you like him --

17   A.      I didn't have --

18   Q.      -- as a person?

19   A.      -- a personal relationship with him, no.

20   On, you know, a professional basis, he was fine.

21   Q.      Did you have any disagreements with Mr.

22   O'Keefe?

23   A.      Not that I can recall.

24   Q.      Did your working relationship with Mr.

1       O'Keefe cause you any stress?

2       A.      Not that I can recall on that.

3       Q.      Did your working relationship with Mr.

4       O'Keefe cause you any anxiety?

5       A.      Not that I can recall.

6       Q.      Did you suffer any panic attacks while

7       working at CVS?

8       A.      I do, yeah.

9       Q.      So you did suffer panic attacks while

10      working at CVS?

11      A.      Uh-huh.  (Indicates affirmatively).  Yes.

12      Q.      Yes.  How many?

13      A.      Offhand, I don't know how many.

14      Q.      More than one?

15      A.      Again, I don't know how many.

16      Q.      What caused these panic attacks?

17      A.      They just come on.

18      Q.      Are they related to stress on the job?

19      A.      I'm not sure.

20      Q.      Do you recall what you were doing when you

21      suffered the panic attacks?

22      A.      I don't recall.

23      Q.      Did you experience any chest tightness while

24      working at CVS?

```
 1      A.      Yes.
 2      Q.      And how many times did that happen?
 3      A.      I don't recall.
 4      Q.      More than once?
 5      A.      I don't recall.
 6      Q.      What caused your chest tightness while
 7   working at CVS?
 8              MR. SCOTT:  Objection.
 9              You can answer, if you know.
10              THE WITNESS:  Ask it again.
11   BY MR. COLOMB:
12      Q.      What caused your chest tightness while
13   working at CVS?
14      A.      Between anxiety and --
15      Q.      And do you know what caused your anxiety?
16      A.      I --
17              MR. SCOTT:  Objection.
18              You can answer.
19              THE WITNESS:  I don't.
20   BY MR. COLOMB:
21      Q.      Do you believe that you were able to perform
22   the functions of your job at CVS?
23      A.      Do I believe?
24      Q.      I am asking your opinion.
```

1    A.    Go ahead.  Ask it again.

2    Q.    Do you believe that you were able to perform

3    the functions of your job at CVS?

4    A.    No.

5    Q.    And what functions were you not able to

6    perform?

7    A.    I wasn't able to perform any cash or

8    inventory functions.

9    Q.    Did CVS prohibit you from performing cash or

10    inventory functions?

11    A.    No.

12    Q.    Did you tell CVS that you were unable or

13    unwilling to perform cash or inventory functions?

14    MR. SCOTT:  Objection.

15    BY MR. COLOMB:

16    Q.    Just so I have the answer on the record, did

17    you answer that question?

18    A.    I didn't, no.  Repeat it.

19    Q.    The question I asked was this.  Did you tell

20    CVS that you were unable to perform cash -- unable

21    or unwilling to perform cash --

22    A.    No.

23    Q.    -- or inventory functions?  Did you, in

24    fact, perform cash and inventory functions at CVS?

1    A.       Yes.

2    Q.       How often?

3    A.       Daily.

4    Q.       Are there other functions of the job that

5    you were unable to perform at CVS?

6    A.       Not that I can recall.

7    Q.       Did you receive any performance evaluations

8    while working at CVS?

9    A.       Not that I can recall.

10   Q.       So when your supervisor informed you that

11   you were not able to perform what they were looking

12   for at CVS, that was a verbal communication?

13   A.       I don't recall whether it was directed.

14   Q.       Did you ever receive anything in writing

15   from CVS commenting on your performance?

16   A.       Not that I can recall.

17   Q.       Did you receive a letter or any paperwork

18   from CVS indicating why your employment ended?

19   A.       I ended the employment.

20   Q.       Did you submit a letter to CVS or anything

21   in writing when you ended the employment?

22   A.       No.

23   Q.       How did you tell CVS that you were ending

24   the employment?

1    A.       Through notice.

2    Q.       To whom did you give the notice?

3    A.       To the manager of that location.

4    Q.       Was that Mr. O'Keefe?

5    A.       No.

6    Q.       Who was that?

7    A.       Eric.  I don't recall his last name.

8    Q.       While you were working at CVS, were you

9    receiving any other source of income?

10   A.       I don't recall.

11   Q.       When did your employment with CVS end?

12   A.       I don't know the exact date.

13   Q.       Do you know the approximate date?

14   A.       I don't.

15   Q.       Do you maintain a résumé?

16   A.       Yes.

17   Q.       Does your résumé list your employment with

18   CVS?

19   A.       I believe.

20            MR. COLOMB:  I believe that is one document

21   we have asked for, so that may help us with these

22   questions.

23   BY MR. COLOMB:

24   Q.       Did you hold any other jobs at the same time

1    as working at CVS?

2    A.      On call.

3    Q.      With the funeral homes --

4    A.      Funeral homes.

5    Q.      -- that we have already talked about?

6    A.      (Indicates affirmatively).

7    Q.      Did you hold any other jobs at the same

8    time?

9    A.      I don't recall.

10   Q.      After leaving CVS, were you employed by

11   anyone else?

12   A.      Yes.

13   Q.      Who was that?

14   A.      Cumberland Farms.

15   Q.      After leaving the employment of CVS and

16   before starting at Cumberland Farms, did you receive

17   unemployment compensation?

18   A.      Not that I recall.

19   Q.      Did you apply for unemployment compensation?

20   A.      Not that I can recall, no.

21   Q.      And where did you work for Cumberland Farms?

22   A.      Their North Attleboro location.

23   Q.      When did you start working for Cumberland

24   Farms?

1      A.      Shortly after CVS.

2      Q.      Do you know how long it was between CVS and

3      Cumberland Farms?

4      A.      No, I don't recall.

5      Q.      What type of work did you perform for

6      Cumberland Farms?

7      A.      Manager in training.

8      Q.      And what was the nature of that position?

9      What were the job duties?

10     A.      Opening the store, closing the store,

11     loading product.

12     Q.      Are you still employed by Cumberland Farms?

13     A.      No.

14     Q.      Did you hold any other positions at

15     Cumberland Farms, other than manager in training?

16     A.      No.

17     Q.      When did your employment with Cumberland

18     Farms end?

19     A.      I don't know the exact date.

20     Q.      Do you know how long, how many months or

21     years you worked for Cumberland Farms?

22     A.      I don't.

23     Q.      Is your employment with Cumberland Farms

24     listed on your résumé?

1    A.      Yes.

2    Q.      Why did you not become a manager with

3    Cumberland Farms?

4    A.      Again, it was cash and inventory.

5    Q.      What about "cash and inventory"?

6    A.      I had panic attacks in the chest.

7    Q.      Did Cumberland Farms ever tell you that they

8    were not going to make you a manager because of cash

9    and inventory issues?

10    A.      I was terminated from Cumberland Farms.

11    Q.      When were you terminated?

12    A.      I don't know the exact date.

13    Q.      Why were you terminated?

14    A.      The inability to pick up their inventory,

15    cash, and ordering systems.

16    Q.      Who was your supervisor while working at

17    Cumberland Farms?

18    A.      I don't recall his name.

19    Q.      It was a man?

20    A.      Yes.

21    Q.      Was this man assigned to the North Attleboro

22    store?

23    A.      Yes.

24    Q.      Was he the manager of the North Attleboro

1    store?

2    A.        Supervisor.

3    Q.        You held the position of manager in

4    training.  Were there other managers in training at

5    the North Attleboro store when you were there?

6    A.        Managers in training, no.

7    Q.        In addition to this man you have identified

8    as your supervisor, were there any other managerial

9    employees in the store?

10   A.        Yes.

11   Q.        Who was that, or who were they?

12   A.        There was a female.  I don't remember her

13   name.

14   Q.        Do you know what her job was?

15   A.        She was the manager of the store.

16   Q.        So this individual that you reported to was

17   a supervisor but was not the manager of the store?

18   A.        She was the manager of the store.  She

19   reported to her supervisor.  I was just training.

20   Q.        And maybe I misunderstood you, but I think

21   you said you reported to a man; is that correct?

22   A.        He was the supervisor.  She reported to him.

23   And he would ask me a question or whatever, and I

24   would answer.

1    Q.        So both you and the manager reported to the

2    same gentleman, --

3    A.        Correct.

4    Q.        -- whoever he was?  Was he in the store

5    every day?

6    A.        Not that I can recall every day.

7    Q.        Do you know if he had responsibility for

8    other stores?

9    A.        I believe he did.

10   Q.        Who informed you that your employment at

11   Cumberland Farms was terminated?

12   A.        The supervisor.

13   Q.        How did he inform you that your employment

14   was terminated?

15   A.        Took me in the office and terminated my

16   employment.

17   Q.        What did he say to you when he terminated

18   your employment?

19   A.        The inability to do the job.

20   Q.        Did he say anything more than that?

21   A.        Not that I can recall.

22   Q.        Did he indicate how you were unable to do

23   the job?

24   A.        Just that I was not picking up the

1      paperwork, and --

2      Q.      Did you suffer any injuries while you were

3      working at Cumberland Farms?

4      A.      Injuries?

5      Q.      Well, we will start with this.  Any physical

6      injuries while working at Cumberland Farms?

7      A.      No.

8      Q.      Did you suffer any mental or psychological

9      injury or trauma while you were working at

10     Cumberland Farms?

11     A.      From Cumberland -- Cumberland Farms?

12     Q.      I am not asking the source.  I am just

13     asking --

14     A.      Okay.

15     Q.      -- if you suffered any injuries.

16     A.      Not that I can recall.

17     Q.      Did you experience any anxiety attacks while

18     working for Cumberland Farms?

19     A.      Yes.

20     Q.      How many anxiety attacks did you have?

21     A.      I don't recall the exact amount, how many

22     times.

23     Q.      Did you say many times?

24     A.      (Witness indicating.)

1                THE REPORTER:  Excuse me?

2                THE WITNESS:  I don't recall exact, how many

3        times.

4        BY MR. COLOMB:

5        Q.      Oh, how many times.  Do you recall how often

6        you suffered anxiety attacks?

7        A.      I don't recall the exact amount of.

8        Q.      Did you suffer any chest pains while working

9        at Cumberland Farms?

10       A.      Yes.

11       Q.      Were these chest pains in connection with

12       the anxiety attacks?

13               MR. SCOTT:  Objection.

14               You can answer.

15               MR. COLOMB:  I will strike --

16               MR. SCOTT:  You can answer.

17               MR. COLOMB:  I will strike the question.

18       That's fine, fair point.

19       BY MR. COLOMB:

20       Q.      How often did you experience chest pain

21       while working at Cumberland Farms?

22       A.      The amounts, it was quite -- quite a bit.

23       Q.      Did you experience chest pain every week?

24       A.      Yes.

1    Q.      Did you experience any other symptoms while

2    working at Cumberland Farms, in addition to the

3    anxiety attacks and the chest pains?

4    A.      Not that I can recall.

5    Q.      After the termination of your employment at

6    Cumberland Farms, did you file for unemployment?

7    A.      Yes.

8    Q.      Did you receive unemployment?

9    A.      I did.

10   Q.      For how long did you receive unemployment?

11   A.      I don't recall the exact dates.

12   Q.      Do you recall if you exhausted the available

13   benefits?

14   A.      I don't recall.

15   Q.      Did you file a workers' compensation claim

16   while working at Cumberland Farms?

17   A.      No.

18   Q.      Did you file a workers' compensation claim

19   after leaving Cumberland Farms?

20   A.      Not that I recall.

21   Q.      I think I neglected to ask you the same

22   questions about CVS.  Did you file a workers'

23   compensation claim while working at CVS?

24   A.      Not that I recall.

1    convenient, maybe we can take a couple-minute

2    break?

3              MR. COLOMB:  Sure.  That's fine.

4              MR. SCOTT:  But at a convenient point.

5              MR. COLOMB:  Why don't we wrap up sort of

6    the same line of questioning --

7              MR. SCOTT:  Sure.

8              MR. COLOMB:  -- on the jobs, and then we

9    will --

10             MR. SCOTT:  Sure.

11             MR. COLOMB:  -- get ourselves to the present

12   day; and then we can go back and take care of

13   whatever we need to take care of?

14   BY MR. COLOMB:

15   Q.      After your employment ended with Cumberland

16   Farms --

17   A.      Uh-huh.  (Indicates affirmatively).

18   Q.      -- and you collected unemployment for some

19   period of time, after that, did you obtain another

20   job, any other jobs?

21   A.      Up until?

22   Q.      Up until right now, today.

23   A.      Recently, yes.

24   Q.      What was the next job that you obtained

1     after Cumberland Farms?

2     A.      Maintenance.

3     Q.      And do you hold that job today?

4     A.      Yes.

5     Q.      Who is your employer?

6     A.      I work through a temp agency.

7     Q.      What is the agency?

8     A.      Reardon and Associates.

9     Q.      Where are they located?

10    A.      They're in Dedham.

11    Q.      And can you tell me how they operate, in

12    other words, how they put you into a work

13    placement?

14    A.      I got the job through a gentleman who's

15    their manager now of maintenance.

16    Q.      Let me ask my question a different way,

17    because I am --

18    A.      Uh-huh.  (Indicates affirmatively).

19    Q.      -- not sure I understood it actually.

20    Does Reardon and Associates find a placement for

21    you to work on a temporary basis at some other

22    company?

23    A.      I'm sure that's what their temp agency does.

24    I went through that temp agency, is where I was told

1    to go through.

2    Q.    You show up at Reardon temp agency at some

3    point?

4    A.    No.

5    Q.    No.  Have you ever been to Reardon temp

6    agency?

7    A.    No.

8    Q.    Does Reardon temp agency send you to other

9    businesses to do work?

10    A.    No.

11    Q.    Then I will just ask the open ended

12    question.  How are you employed by Reardon temp

13    agency?  What do you do that they pay you for?

14    A.    I --

15    MR. SCOTT:  First of all, let me object to

16    the question.

17    But you can answer it.

18    THE WITNESS:  I just -- that's how the

19    gentleman ran me through his temp agency.  I

20    don't -- that's how they pay me, is through his temp

21    agency.

22    BY MR. COLOMB:

23    Q.    Okay.

24    A.    That's who he hires temps from, and I just

1   went in, paperwork, and Reardon picks -- does all my

2   paperwork.

3   Q.      So where do you physically do maintenance

4   work?

5   A.      In Stoughton.

6   Q.      Now, we are getting somewhere.  Now, we are

7   getting somewhere.

8   A.      I've just never been to Reardon.

9   Q.      Got you, okay.  What is the location in

10  Stoughton where you are doing the work?

11  A.      It's a warehouse.  The location is on Kay

12  Way in Stoughton.

13  Q.      Do you know who owns this warehouse?

14  A.      Harold Garber.

15  Q.      What does Harold Garber do, if you know?

16  A.      I believe he's the owner.

17  Q.      Do you know what happens in this warehouse?

18  A.      Yes.

19  Q.      What happens in the warehouse?

20  A.      They deal with machinery, conveyor systems.

21  Q.      Is a product manufactured in this

22  warehouse?

23  A.      I don't know where they manufacture their

24  product.  I know it comes in and goes out.

1    Q.      Do you know what the product is that comes

2    in and --

3    A.      Yes.

4    Q.      -- goes out?

5    A.      Uh-huh.   (Indicates affirmatively).

6    Q.      What is the product?

7    A.      It's cigarettes, groceries, juices.

8    Q.      So is it your understanding they are a

9    distributor?

10   A.      Right.

11   Q.      Is Garber the convenience store people?

12   A.      Yes.

13   Q.      I hadn't heard of the Harold.  That is an

14   individual?  That is a gentleman, --

15   A.      It's the owner.

16   Q.      -- Harold Garber?

17   A.      Correct.

18   Q.      So I understand then you are an employee of

19   this Reardon?

20   A.      Right.

21   Q.      But you physically report to work at the

22   Garber warehouse?

23   A.      Correct.

24   Q.      And at the Garber warehouse you are

1     performing maintenance functions?

2     A.       Right.

3     Q.       Can you describe those functions?

4     A.       Putting together conveyor systems,

5     maintaining conveyor systems.

6     Q.       Do you do any other tasks?

7     A.       Meaning do I change a light bulb?  Yes.

8     Q.       Do you do any cleaning tasks?

9     A.       Other than after what we've done, put

10     together.

11     Q.       Do you operate any machinery?

12     A.       Yes.

13     Q.       What type of machinery do you operate?

14     A.       Fork trucks, Hella trucks.

15     Q.       Do I understand that you know Harold

16     Garber?

17     A.       Just through passing in the halls.

18     Q.       So how did you come to obtain this job?

19     A.       Through a friend of mine.

20     Q.       Who is the friend?

21     A.       Ed Brown.

22     Q.       And does Mr. Brown work at this

23     establishment?

24     A.       Yes.

1   Q.      And again, I am just trying to make sure I

2   understand this.  You first went and talked to

3   someone at Garber who told you that you would be

4   employed through Reardon?

5   A.      No.

6   Q.      No?  What happened after you spoke with Mr.

7   Brown?

8   A.      Went through Mr. Brown.

9   Q.      Yes.

10  A.      Who in turn put me through Reardon.

11  Q.      I see.  Are you able to perform the

12  functions of this maintenance position?

13  A.      For what I -- yes.

14          THE REPORTER:  Excuse me?

15          THE WITNESS:  Yes.

16          THE REPORTER:  Thank you.

17  BY MR. COLOMB:

18  Q.      Who is your supervisor in this job?

19  A.      Ed Brown.

20  Q.      Now, you said Mr. Brown referred you into

21  this position?

22  A.      Right.

23  Q.      How do you know Mr. Brown?

24  A.      He's a neighbor.

1    Q.    When did you start this job?

2    A.    I don't recall the exact date.

3    Q.    Do you know how long you have been working

4    in this position?

5    A.    Probably about a year and a half.

6    Q.    Are you paid by the hour?

7    A.    Yes.

8    Q.    How much are you paid?

9    A.    $19 an hour.

10   Q.    Are you a full-time employee?

11   A.    I go through the temp agency.

12   Q.    I am just interested in how many hours you

13   work per week.

14   A.    Because I don't work for them.

15   Q.    I understand that.

16   A.    Okay.

17   Q.    Right.  Do you typically work 40 hours per

18   week?

19   A.    Yes.

20   Q.    Do you perform overtime work?

21   A.    Yes.

22   Q.    And I am assuming these wages are taxed

23   wages?

24   A.    Right.

1    Q.        And what were those responsibilities, if you
2    could describe them, please?
3    A.        The manager's responsibilities?
4    Q.        Yes.
5    A.        From what I was overseeing, was she was
6    responsible for pretty much running a convenience
7    store.
8    Q.        Again, I am asking specific to cash
9    management.  What were the responsibilities of the
10   manager as you observed her?
11   A.        Again, she would count up the cash, make the
12   deposit, bring it to the bank.
13   Q.        Were you capable of performing those
14   functions?
15   A.        Other than the issue that I was having with
16   cash and those particular areas, I could handle the
17   manager functions.
18   Q.        In your current employment, do you have any
19   responsibility for cash?
20   A.        No.
21   Q.        Are you able to perform the functions of
22   your current job?
23   A.        I don't deal with cash or paperwork or -- I
24   just go in and put machines together.

1    Q.     And are you able to satisfactorily do that

2    work?

3    A.     Satisfactorily doing that.

4    Q.     Have you ever been evaluated by your current

5    employer?

6    A.     No.

7        MR. SCOTT:  For?

8        MR. COLOMB:  For performance.

9        MR. SCOTT:  Could you clarify that?

10       MR. COLOMB:  Sorry.  Yes.

11  BY MR. COLOMB:

12    Q.     Has your performance ever been --

13    A.     No.

14    Q.     -- evaluated in any way by your current

15    employer?

16    A.     Other than an increase we've had, yeah.

17    Q.     And you have received increases in pay?

18    A.     Yeah.

19    Q.     More than one?

20    A.     Just one.

21    Q.     Has your current employer expressed any

22    dissatisfaction with your performance at any time?

23    A.     No.

24    Q.     Do you maintain your own personal finances

1      in your household?

2      A.      Yes.

3      Q.      And are you able to perform those

4      functions?

5      A.      Somewhat.

6      Q.      Does performing those functions cause you

7      to have anxiety attacks or panic attacks?

8      A.      Yeah.

9      Q.      What about household cash management causes

10     you to have anxiety attacks?

11     A.      Oh, no, I just make sure the funding's

12     there for it.

13     Q.      Do you make bank deposits of your personal

14     funds?

15     A.      Yes.

16     Q.      Do you pay your own personal bills?

17     A.      Yes.

18     Q.      Are you able to achieve those tasks without

19     concern or panic attacks?

20     A.      My wife and I do it.

21     Q.      But again, performing those function for

22     your personal finances, do they cause you to suffer

23     panic attacks?

24     A.      They're there.

1    Q.    Does anything other than cash, finance, and

2    accounting, and again, those are my words not yours,

3    does anything other than that cause you to suffer a

4    panic attack?

5              MR. SCOTT:  Objection.

6              You can answer.

7              THE WITNESS:  There's probably a few things.

8    I couldn't pinpoint what they were.

9    BY MR. COLOMB:

10   Q.    Are you a physically active person?

11             MR. SCOTT:  Objection.

12             You can answer, if you understand.

13   BY MR. COLOMB:

14   Q.    I will --

15   A.    I do okay.

16   Q.    We will go through some specifics then.  Do

17   you engage in sports?

18   A.    A couple times, so I guess, yes.

19   Q.    What sports do you participate in?

20   A.    I've done a softball league.

21   Q.    Any other sports?

22   A.    Fishing.

23   Q.    Did you participate in a softball league

24   before working at Christy's Markets?

```
1    A.      No.
2    Q.      Did you participate in a softball league
3    after your employment ended with Christy's Markets?
4    A.      Currently, --
5    Q.      You currently --
6    A.      -- doing softball.
7    Q.      -- participate.  Did you fish before you
8    started working at Christy's Markets?
9    A.      Yes.
10   Q.      And have you fished since leaving Christy's
11   Markets?
12   A.      I don't recall.
13   Q.      Is there any reason why you haven't been
14   fishing?
15   A.      Don't recall.  I mean, --
16   Q.      How do you like to spend your recreational
17   time when you are not working?
18   A.      With my family.
19   Q.      And did you spend your time with your
20   family before working at Christy's Markets?
21   A.      Pretty much spent time the past 18 to 22
22   years with my family.
23   Q.      And has that changed during that 18-year
24   period?  Has there been any change?
```

1    A.      In?

2    Q.      Meaning in the frequency or the type of

3    activities you engage in with your family.

4    A.      I don't recall.

5    Q.      Do you do anything else for recreation?

6    A.      No.

7    Q.      I believe you mentioned an ankle injury --

8    A.      Uh-huh.  (Indicates affirmatively).

9    Q.      -- this morning, which we were trying to

10   determine when that happened, whether it was while

11   you were working at Christy's or possibly at some

12   other time.  Other than that ankle injury, prior to

13   working at Christy's market, had you suffered any

14   physical injuries or ailments of any significance?

15   A.      Clarify what -- Christy's market or

16   Christy's of Cape Cod?

17   Q.      Christy's of Cape Cod.  Well, any --

18   A.      Christy's of Cape Cod.

19   Q.      -- Christy's employment.  I am just going

20   back to 1998.

21   A.      Okay.  I wasn't working for them at the

22   time, --

23   Q.      Right.

24   A.      -- Christy's market.

1    Q.      I understand.

2    A.      I was working for Christy's of Cape Cod.

3    Q.      Okay.

4    A.      Okay.

5    Q.      Prior to 1998, had you suffered any

6    significant injuries or illnesses of any kind,

7    physically?

8    A.      I've already answered those prior to.

9    Q.      Okay.

10   A.      I believe I've already answered them.

11   Q.      Can you answer it again, please?

12   A.      I believe I already answered it for you.  We

13   just went through all this.

14          MR. SCOTT:  I think this is a different

15   question, because he is putting a time frame on it

16   now.  So why don't you go ahead and answer?

17          THE WITNESS:  Okay.  I don't recall.

18   BY MR. COLOMB:

19   Q.      You don't recall what your health was prior

20   to 1998, if you had any major health issues?

21   A.      No, nothing major.

22          MR. SCOTT:  Can I confer with Mr. Whalon for

23   a moment?

24          MR. COLOMB:  Sure.

1            MR. SCOTT:  Before he answers another

2      question?

3            MR. COLOMB:  Yes.  Do you want us to step

4      out for a moment?

5            MR. SCOTT:  Oh, no.  No.

6            MR. COLOMB:  Okay.

7            (Discussion off the record.)

8            MR. SCOTT:  Sorry.

9            MR. COLOMB:  That's fine.

10      BY MR. COLOMB:

11      Q.      Again, we have discussed an ankle injury,

12      and you have discussed -- well, started to discuss,

13      and we are certainly going to be discussing further

14      panic attacks, chest pains, those types of issues.

15      Other than that, have you had any health problems

16      since 1998?

17      A.      To present?

18      Q.      To present, correct.

19      A.      Yes.

20      Q.      What is the nature of those problems?

21      A.      The ankle injury.

22      Q.      The ankle injury, which we discussed this

23      morning?

24      A.      (Indicates affirmatively).

1    Q.      Any other physical ailments from 1998 to the

2    present, other than the ankle injury?

3    A.      Physicals meaning?  Just clarify it a little

4    bit more.

5    Q.      Have you had any surgery since 1998, other

6    than the ankle?

7    A.      No.

8    Q.      Have you had any back injuries since 1998?

9    You mentioned one, I believe, that was prior to

10   1998 --

11   A.      Prior.

12   Q.      -- this morning.

13   A.      Right.  Right.

14   Q.      Have you had any overnight hospitalization

15   since 1998, other than the ankle?

16   A.      Yes.

17   Q.      What was that for?

18   A.      Migraines.

19   Q.      When did that happen?

20   A.      They've been happening quite sometime.

21   Q.      How many times have you been hospitalized

22   for migraines?

23   A.      I don't recall the exact amount of times.

24   Q.      More than five times?

 1     A.      I don't recall the exact amount.

 2     Q.      More than once?

 3     A.      More than once.

 4     Q.      When was the first time you were

 5     hospitalized for a migraine?

 6     A.      I don't have the exact dates.

 7     Q.      Do you have any idea as to the date?

 8     A.      Migraines come on.  There's no set time on

 9     them.

10     Q.      I understand what a migraines is.  I am

11     asking a very --

12     A.      Okay.

13     Q.      -- specific question now as to

14     hospitalization.

15     A.      I don't recall the exact dates.

16     Q.      Well, you keep saying, "exact dates."  If

17     you recall --

18     A.      I don't recall --

19     Q.      -- something other than --

20     A.      -- the exact dates.

21     Q.      -- an exact date --

22     A.      -- of when they -- when I was hospitalized

23     for them.

24     Q.      One of the things for Mr. Kielty is we can't

```
 1     be talking over each other, so we have --
 2     A.      Uh-huh.   (Indicates affirmatively).
 3     Q.      -- to have one talk, and then the other
 4     person talk.
 5             I was simply questioning your use of "I
 6     don't recall the exact dates."  If you have any
 7     recollection at all, I would like to --
 8     A.      I don't --
 9     Q.      -- know that.
10     A.      I don't recall the dates.
11     Q.      Did you suffer migraines prior to your
12     employment with Christy's?
13     A.      Yes.
14     Q.      Other than migraines, other than the ankle
15     injury that we have spoken of, have you been
16     hospitalized for anything else since 1998?
17     A.      Yes.
18     Q.      What else have you been hospitalized for?
19     A.      Jaw surgery.
20     Q.      Did you suffer an injury to your jaw?
21     A.      Years earlier.
22     Q.      How did you injure your jaw?
23     A.      I was kicked in the mouth.
24     Q.      So I understand, were you treated at the
```

 1     time of the injury, and then you required additional

 2     treatment --

 3     A.      Right.

 4     Q.      -- since 1998?

 5             MR. SCOTT:  Try to let him finish his whole

 6     sentence before you answer.

 7             THE WITNESS:  Okay.

 8     BY MR. COLOMB:

 9     Q.      Other than the ankle, the migraines, and

10     the jaw surgery, have you been hospitalized since

11     1998?

12     A.      Again, just the migraines.

13     Q.      At some point in time, did you come to be

14     employed by Christy's?

15     A.      After when?

16     Q.      Well, in 1998, did you take a job with

17     Christy's?

18     A.      Right.  Yes.

19     Q.      Can you tell us, please, when I say,

20     "Christy's" what that meant in 1998 when you first

21     started employment, what was that organization?

22     A.      It was Christy's of Cape Cod.

23     Q.      And how did it happen that you were employed

24     by Christy's of Cape Cod?

1    A.    Christy's Markets were selling their

2    locations.

3    Q.    Were you working in one of those locations

4    prior to 1998?

5    A.    I was their food service.

6    Q.    And prior to 1998, what company were you

7    working for?

8    A.    Prior to?

9    Q.    Yes.

10    A.    Christy's Markets.

11    Q.    And Christy's Markets became Christy's of

12    Cape Cod in 1998?

13    A.    The stores that he kept down the Cape, yes.

14    Q.    The original Christy's Markets, when did you

15    first start working for that company?

16    A.    I don't recall the exact date I started with

17    them.  I was a sales associate all the way up to the

18    position that I was in.

19    Q.    Did you start working in a particular store

20    location?

21    A.    Their Taunton location.

22    Q.    In 1998, when Christy's Markets ceased to be

23    Christy's Markets and became Christy's of Cape Cod,

24    what position were you holding at that time, at the

1    time of the change?

2    A.      I don't believe that we're going to get

3    spoken to on what positions were available in the

4    company, Christy's Market, Inc., through the

5    company.

6    Q.      I guess what I am asking is this.  What was

7    the last position you held at Christy's Markets, --

8    A.      Was the food service.

9    Q.      -- Inc.?  Food service?

10   A.      I don't know their exact terminology on it.

11   It was their food service.

12   Q.      Was it a managerial position?

13   A.      It was overseeing some locations they had.

14   Q.      What did you do in this job?

15   A.      I was -- they had Taco Bell, oversee the

16   Taco Bell programs, make sure the stores were

17   running them right.

18   Q.      Did you have other responsibilities?

19   A.      Yeah, they also had Fresh Express, making

20   sandwiches, a lot of food service training.

21   Q.      Were you responsible for specific stores?

22   A.      Yes.

23   Q.      Do you recall what those stores were?

24   A.      What they were?

1    Q.       What locations they were?

2    A.       They were between Connecticut, Cape Cod,

3    Boston.

4    Q.       Let me ask that a different way.  Were you

5    responsible for this function at all Christy's

6    Market locations?

7    A.       At all, no.

8    Q.       So there were other individuals who were

9    responsible for the food service function of other

10   locations?

11   A.       Right.

12   Q.       Was your performance ever evaluated while

13   you were working for Christy's Markets, Inc.?

14   A.       I don't recall.  I don't have that folder.

15   Q.       Were you ever disciplined while working for

16   Christy's Markets, Inc.?

17   A.       I don't recall.

18   Q.       Were you ever told that your performance was

19   unacceptable while working for Christy's Markets,

20   Inc.?

21   A.       I don't recall.

22   Q.       Who was your supervisor when you were

23   working as the food service trainer at Christy's

24   Markets, Inc.?

1    A.    It was Patrick McKeown.

2    Q.    As the food service trainer, did you have

3    any responsibilities for cash management?

4    A.    No.

5    Q.    As the food service trainer, did you have

6    any responsibilities for computers or computer

7    systems?

8    A.    Not at the time.

9    Q.    As the food service trainer, were you

10    capable of performing all the functions of your

11    job?

12    A.    With what information I had, yes.

13    Q.    Did you suffer any injuries while working

14    for Christy's Markets, Inc.?

15    A.    I don't recall.

16    Q.    What was your relationship like with Mr.

17    McKeown while you were working for Christy's

18    Markets, Inc.?

19         MR. SCOTT:  Objection.

20         You can answer.

21         THE WITNESS:  Didn't seem to have any

22    problems.

23    BY MR. COLOMB:

24    Q.    Now, something happened in 1998 where

1    Christy's Markets, Inc. ceased to exist and a new

2    company came into being; is that your

3    understanding?

4    A.       Right.

5    Q.       And can you tell us what happened in 1998?

6    A.       Other than they sold Christy's up here in

7    New England and spun off his own company on the

8    Cape.

9    Q.       What happened to your employment at that

10    time?

11    A.       Again, they were supposed to let us know

12    what we would be doing, if there was a position

13    available in talking to each individual.

14    Q.       Did someone talk to you about the

15    possibility of available positions?

16    A.       No, I hadn't talked to anybody about it.

17    Q.       Did you eventually obtain a position with

18    Christy's of Cape Cod?

19    A.       I did.

20    Q.       How did you obtain that position?

21    A.       I asked Patrick if he needed anybody to work

22    down the Cape.

23    Q.       What did he say to you?

24    A.       He needed a manager at the time.

1     during those five years?

2     A.        Right.  Yes.

3     Q.        And you performed additional functions as

4     well?

5     A.        Right.

6     Q.        Let's start with the marketing counselor

7     job.  Can you tell me what that job requires?

8     A.        That requires the daily operations of their

9     stores.

10    Q.        During the -- what was it, four to five

11    years that you served as the marketing counselor,

12    were you only the individual filling that job?

13    A.        Yes.

14    Q.        Would I be correct to understand then that

15    your marketing counselor responsibilities were for

16    all stores in the company?

17    A.        Yes.

18    Q.        Now, when you say "daily operations of

19    their stores," can you be more specific as to what

20    you were expected to do?

21    A.        I was to make sure that the stores were

22    open and closing, they were staffed, and that the

23    manager was performing their duties.

24    Q.        To whom did the store managers report?

1    A.    To Patrick and myself.

2    Q.    And to whom did you report?

3    A.    To Patrick.

4    Q.    In addition to ensuring the stores were

5    opening and closing, staffed, and that the manager

6    was performing the duties, did you have any other

7    responsibilities as the marketing counselor?

8    A.    To check off, do store audits, just check

9    off their bank slips, along with Patrick doing the

10    same.

11    Q.    Did you have any responsibility for

12    inventory?

13    A.    I was to be present at the inventories.

14    Q.    Did you have any responsibility for ordering

15    product for stores?

16    A.    Ordering their daily functions the managers

17    would do, or --

18    Q.    The items that they would stock on the

19    shelves to sell.

20    A.    If they needed help, the manager, then I

21    would go in and help them stock or order.

22    Q.    If a manager didn't seek your help, that was

23    something that you would not normally do?

24    A.    No.

1    Q.    What responsibilities did you have for

2    supervising store managers?

3    A.    Meaning what was my responsibilities?

4    Q.    Yes.

5    A.    To make sure, again, that they were doing

6    their job.

7    Q.    Did you complete written evaluations of

8    store managers?

9    A.    On occasion.

10   Q.    What would you do if you found a store

11   manager who was not doing their job?

12   A.    Then we would issue a performance notice.

13   Q.    Would you personally issue the performance

14   notice?

15   A.    Patrick or myself would.

16   Q.    Did you have any other role in the

17   discipline of store managers?

18   A.    Other than?

19   Q.    Issuing a performance notice.

20   A.    There was termination notices to go along

21   with it.  I would, you know, step in, terminate an

22   employee if I see --

23   Q.    Did you ever terminate an employee?

24   A.    Yes.

1    Q.      Did you ever issue performance notices?

2    A.      Yes.

3    Q.      As the marketing counselor, were you

4    responsible for knowing and understanding the

5    policies of the company?

6    A.      Policy, we had a policy manual, every store

7    had.

8    Q.      Did you read the manual?

9    A.      Yes, I did.

10   Q.      And were you familiar with its contents?

11   A.      Yes.

12   Q.      Was it your responsibility to make sure that

13   store managers were following policies as set forth

14   in that manual?

15   A.      Yes.

16   Q.      And if a store manager wasn't following one

17   of those policies, what would you do?

18   A.      We would make sure that they were following

19   the policies as they were written.

20   Q.      Would you discipline a manager for failing

21   to follow policies?

22   A.      I believe we would.

23   Q.      And did you, in fact, ever discipline a

24   manager for failing to follow the policies of the

1    manual?

2    A.      I don't recall.

3    Q.      Now, a moment ago I think you said, "I

4    believe we would."  When you say "we," who is the

5    "we" that you are referring to?

6    A.      Both Patrick and myself.

7    Q.      If you observed a manager failing to follow

8    a policy, did you need to speak to Patrick before

9    issuing discipline, or were you authorized to issue

10   discipline on your own?

11   A.      It'd go through Patrick and then back down

12   to me on what to do.

13   Q.      Was that the case with all disciplines?

14   A.      I don't know all.  I just know the majority,

15   yes.

16   Q.      How much time did Mr. McKeown spend in the

17   stores?

18   A.      I don't know the exact amount of time he

19   spent in them, but he was in them quite frequently.

20   Q.      How much time did you spend in the stores?

21   A.      A lot of time.

22   Q.      Were you in the stores every day?

23   A.      Not every store.

24   Q.      Did you have a set schedule for visiting

1    stores?

2    A.      Schedule for?  I would go in a couple of

3    stores a day to go to.

4    Q.      How would you determine what couple of

5    stores you would go to on a particular day?

6    A.      If there was a problem with help or stocking

7    and something wasn't full.

8    Q.      Did Mr. McKeown tell you what stores to go

9    to?

10   A.      He would rec- -- he would suggest, or if he

11   happened to be in a store and it needed a little

12   work, either he would do the work, or I would do --

13   call me.  And I'd go and do it.

14   Q.      If you decided that you wanted to go to a

15   particular store on a particular day, were you free

16   to do so?

17   A.      If the store was having a problem, yeah.

18   Q.      Did you ever go to stores that weren't

19   having problems?

20   A.      Yes.

21   Q.      How would you learn that stores were having

22   problems?

23   A.      Communication between the office and

24   myself --

1    A.      Yes.   Sorry.

2    Q.      What do you recognize it to be?

3    A.      Without the whole thing here, it looks like

4    part of the policy manual.

5    Q.      And on the second page, does it say, "200

6    Series Store Funds"?

7    A.      Yes.

8    Q.      Now, looking through the pages after that,

9    they are numbered 32 through 37, although I guess

10   37 is blank, are you familiar with these policies?

11   A.      I recall some of these policies.

12   Q.      What do you recall them from?

13   A.      I believe it's in the policy manual.

14   Q.      As the marketing counselor, were you

15   responsible for ensuring compliance with these

16   policies?

17   A.      Again?  Say it again.

18   Q.      As the marketing counselor, were you

19   responsible for ensuring compliance with these

20   policies, these policies were followed?

21   A.      The managers were responsible for making

22   sure these policies were followed.

23   Q.      And as supervising the managers, were --

24   A.      To make sure --

1    Q.        -- you responsible --

2    A.        -- that the managers, right.

3              MR. SCOTT:  Wait for the question.

4              THE WITNESS:  All right.

5    BY MR. COLOMB:

6    Q.        In supervising the managers, were you

7    responsible for making sure that they were enforcing

8    these policies?

9    A.        Right.

10             MR. COLOMB:  I will just say this on the

11   record as well.  I have a few other excerpted

12   sections.  I am not going to ask questions, just

13   want to identify them for the record.

14             (Defendant's Exhibit No. 4 was marked for

15   identification.)

16   BY MR. COLOMB:

17   Q.        Mr. Whalon, I have placed another set of

18   policies in front of you.  The second page

19   identifies it as "202 Series Store Assets."

20   A.        Uh-huh.  (Indicates affirmatively).

21   Q.        And it is a number of individual policies on

22   numbered pages 45 to 53.  Do you recognize these

23   policies?

24             (Discussion off the record.)

1           MR. COLOMB:  Do you want a moment?

2           MR. SCOTT:  Was there a question?

3    BY MR. COLOMB:

4    Q.      I just asked if you recognized the

5    policies?

6    A.      It looks a little odd here with some of the

7    spellings and things in here.

8    Q.      Can you --

9    A.      It looked like something that --

10   Q.      -- identify what is the -- what is

11   concerning?

12   A.      They would have on their manual the

13   company.  Pretty much that's all in here is

14   Christy's --

15           THE REPORTER:  I'm sorry?

16           THE WITNESS:  Christy's equals "S."

17   BY MR. COLOMB:

18   Q.      Right, well, I am assuming that is supposed

19   to be an apostrophe.

20           Well, I certainly will agree that the

21   document throughout --

22   A.      Okay.

23   Q.      -- seems to have --

24   A.      It seems --

1      Q.      -- an equal sign in place of an apostrophe.

2      A.      A few little --

3      Q.      Other than that, --

4      A.      -- discrepancies in there.

5              THE REPORTER:  Sir.

6      BY MR. COLOMB:

7      Q.      -- are there other discrepancies?

8              (Discussion off the record.)

9              MR. SCOTT:  Could we go off the record?

10             MR. COLOMB:  Yes, let me just --

11             MR. SCOTT:  Well, wait.  Is there a

12     question --

13             MR. COLOMB:  Yes.

14             MR. SCOTT:  -- pending.

15             MR. COLOMB:  I mean, is their a question

16     pending, John?

17             THE REPORTER:  Yes.

18             (Requested portion was read by the court

19     reporter.)

20             MR. SCOTT:  Well, that was the equal sign

21     for Christy's.

22             MR. COLOMB:  In fact, let's just -- I will

23     withdraw the question for the moment.  We will go

24     off the record.

1     (Brief recess.)

2     (Defendant's Exhibit No. 5 was marked for

3  identification.)

4     MR. COLOMB:  We will go back on.  Just for

5  point of clarification, while we were off the

6  record, it appears that the excerpts from the

7  policy manual that were introduced as Exhibits 3

8  and 4 are, in fact, from an electronic version of

9  the policy manual, which, as far as I know,

10  represents what is in the printed policy manual.

11     However, the witness properly pointed out

12  that it was not a document that he was familiar

13  with working at the company, so I do not intend to

14  rely on Exhibits 3 and 4.  Instead, we have

15  obtained the policy, the printed policy manual, in

16  fact, that the plaintiff has produced in this case,

17  and I am going to ask him to take a look at that in

18  a moment and identify that as an accurate copy of

19  the policy manual that he utilized working for the

20  company.

21  BY MR. COLOMB:

22  Q.  So if you could take a moment to look at

23  what has been marked now as Exhibit 5?

24     Mr. Whalon, have you had a chance to look at

1     what has been marked as Exhibit 5?

2     A.      Are you using the whole manual now, or are

3     you going to --

4     Q.      Well, forgetting --

5     A.      Okay.

6     Q.      -- the other item, this is the document that

7     you produced through your attorney, and I am just

8     asking you if you recognize this document?

9     A.      Yes.

10    Q.      What do you recognize it to be?

11    A.      Looks like their policy manual.

12    Q.      And when you were earlier this afternoon

13    making reference to the policy manual, was this the

14    document you were talking about?

15    A.      Yes.

16    Q.      Excellent.  We can move off the policy

17    manual.  I want to ask you about two specific tasks

18    that you identified through the marketing counselor.

19    One of them was bank slips.  You indicated that was

20    a responsibility of the marketing counselor, was

21    bank slips?

22    A.      Can you ask the question again?

23    Q.      Sure.  All I wanted to know, that I would

24    want to note for the record that you made reference

1     to the policy manual in answering the question.  All

2     I wanted to know is what you meant when you

3     indicated that the responsibility of the marketing

4     counselor was bank slips.  What does that mean?

5     A.     If there was a bank slip missing or anything

6     like that, that they notify me.

7     Q.     "They" being?

8     A.     Store managers.

9     Q.     And what policy are you looking at in the

10    handbook at this point?

11    A.     200-003.

12    Q.     I don't have a problem if you need to make

13    reference to the manual for something, but I would

14    like to explore first what you remember.  So if you

15    are unable to answer a question but think the manual

16    may help you, let me know that.  But in answering

17    the questions, I would ask you to answer them first

18    from your memory before we start looking at that

19    manual, okay?

20           You also mentioned store audits.

21    A.     Uh-huh.  (Indicates affirmatively).

22    Q.     What would the responsibility of the

23    marketing counselor be, or what was your

24    responsibility with respect to store audits?

1    A.    To -- if I was to go in and do a cash audit

2    on the store, I would do a cash audit on the store.

3    Q.    Okay.

4    A.    Lottery tickets, cigarettes, phone cards.

5    It was just a report that I would hand over to

6    Patrick, and I would do those as often as I could.

7    Q.    Was there any set requirement that you do a

8    store audit at any particular time?

9    A.    No.

10    Q.    How would you decide, make the decision that

11    you were going to do a store audit?

12    A.    Again, if Patrick would call me and said

13    there was a little problem with the store or

14    something, I'd go in and do a cash audit.  If I was

15    there, I'd do a cash audit.  Just, you know, that I

16    was there.

17    Q.    Would you ever do a cash audit without

18    Patrick telling you to do so?

19    A.    If I needed to, if the store manager called

20    me and said they were having a problem in the

21    store, I would do a cash audit in the store for

22    them.

23    Q.    And did that ever happen?

24    A.    It happened quite a few times.

1    Q.    And what is involved in doing a cash audit?

2    A.    Again, it's tallying up sales, phone cards,

3    lottery tickets, cigarette sales.

4    Q.    And what period of time are you looking at?

5    A.    For?

6    Q.    For a cash audit.

7    A.    Usually up till where they're missing their

8    product or their cash or whatever they're missing.

9    Q.    So do I understand that there is

10   flexibility, you could do a cash audit for one day,

11   you could do a cash audit for multiple days?

12   A.    One day.

13   Q.    One day?

14   A.    Uh-huh.  (Indicates affirmatively).

15   Q.    And by "one day," meaning the period of

16   time in one 24-hour block when the given store was

17   open?

18   A.    Right.

19   Q.    At the time you were employed, did Christy's

20   of Cape Cod operate 24-hour stores?

21   A.    They did.

22   Q.    Were all of the stores 24 hours?

23   A.    No.

24   Q.    So it varied store to store?

1    A.        (Witness indicating.)

2              THE REPORTER:  Excuse me, sir.   I'm sorry.

3    Could you answer for the record, please?  You just

4    sort of gestured.

5              THE WITNESS:  No, I already answered it.

6              MR. SCOTT:  Could you read back the last

7    question?

8              (Requested portion was read back by the

9    court reporter.)

10   BY MR. COLOMB:

11   Q.        Oh, I think the court reporter is

12   indicating --

13             THE WITNESS:  Oh, sorry.

14             MR. COLOMB:  I'm sorry.  I didn't notice

15   that either.

16   BY MR. COLOMB:

17   Q.        So it would vary from store to store whether

18   the hours for the particular store would be open; is

19   that right.

20   A.        Right.  Yes.

21   Q.        Thank you.

22             THE WITNESS:  Sorry.

23             THE REPORTER:  Thank you.

24   BY MR. COLOMB:

1    Q.        In your role as marketing counselor, were

2    there any other job responsibilities that we haven't

3    talked about?

4    A.        In the marketing counselor's --

5    Q.        Marketing counsel.

6    A.        -- position that we haven't talked about?

7    There was, like I said, various jobs.  I would

8    actually run a store for them, manage it, lack of

9    help.  Again, I took care of their computer systems.

10   I did all their PLU programming for them.

11   Q.        When you say you would come in and run a

12   store for them, what would cause that to happen?

13   A.        If a manager didn't show up or we terminated

14   them, didn't have a filled position, and couldn't

15   get anybody else to come in and do it.

16   Q.        How often did that happen, that you would

17   need to run a store?

18   A.        I don't recall how many times, but it was

19   quite frequent.

20   Q.        Now, you indicated responsibility for

21   computers.

22   A.        Uh-huh.  (Indicates affirmatively).

23   Q.        Can you tell me what responsibility you had

24   for computers?

1    Q.      How did you learn that you were responsible

2    for these computer tasks?

3    A.      It was just kind of thrown on my lap.

4    Q.      I believe you said Mr. Price, the

5    comptroller, --

6    A.      Uh-huh.  (Indicates affirmatively).

7    Q.      -- handled it prior to you?

8    A.      Right.

9    Q.      Do you know if he had any education on

10   computer programming?

11   A.      I can't answer for him.

12   Q.      Don't know.  Were you paid on a salary or an

13   hourly basis?

14   A.      Salary.

15   Q.      You identified a number of computer

16   functions and identified a number of marketing

17   counselor functions.  Are there any other functions

18   that you performed for Christy's of Cape Cod?

19   A.      I still continued to do their food service

20   for them, also.

21   Q.      And how many stores had a food service

22   operation?

23   A.      I believe it was three.

24   Q.      And what would you do for those three

1    stores?

2    A.      Any of the Taco Bell stores that they

3    originally had.

4    Q.      And the individuals who staffed these Taco

5    Bell stores, do you know if they were employed by

6    Christy's?

7    A.      The manager staff of Taco Bell, they were

8    employed by Christy's.

9    Q.      So the manager would personally make the

10   tacos?

11   A.      I was told they did.

12   Q.      Were there any other folks that worked at

13   the --

14   A.      They did have --

15   Q.       -- Taco Bell portion?

16   A.      Right, these are Taco Bell Express

17   locations, which Christy's staffs.

18   Q.      So is this a counter within the --

19   A.      Right.

20   Q.       -- existing Christy's store?  Is food

21   prepared at that counter, or is it just heated at

22   the counter?

23   A.      It's everything's done right there.

24   Q.      And again, if the managers and Christy's

1    staff members were physically standing behind this

2    counter preparing the food, what responsibility did

3    you have?

4    A.       It was just to make sure that they were

5    serving the food properly, the right temperatures,

6    they had the product.

7    Q.       And how did this differ, if it did, from

8    your overall responsibility to ensure that the

9    stores were operating properly?

10   A.       I mean, I would have to make sure the thing

11   was open.  It had to be open.

12   Q.       How could it not be open?

13   A.       The Taco Bell manager or the store manager

14   didn't open it, you know, somebody didn't show up

15   for work.

16   Q.       So, again, it would be an absenteeism

17   issue?

18   A.       Right.

19   Q.       Which I assume you encountered in the stores

20   as well?

21   A.       Right.

22   Q.       And I assume, for example, in your

23   supervision of stores, you were responsible to make

24   sure the freezers were at the right temperatures,

1    refrigerators were at the right temperatures, is

2    that a correct assumption?

3    A.      That would be the Taco Bell manager that

4    would make sure that whatever they were storing in

5    there would be at that temperatures.

6    Q.      Any other responsibilities that we haven't

7    talked about?

8    A.      Not that I can recall.

9            THE REPORTER:  I'm sorry?

10           THE WITNESS:  Not that I can recall.

11   BY MR. COLOMB:

12   Q.      From 1998 through 2002, was your performance

13   ever reviewed while you were working for Christy's

14   of Cape Cod?

15   A.      Not that I can recall.

16   Q.      Did Mr. McKeown ever discuss your

17   performance with you?

18   A.      Not that I can recall.

19   Q.      Did you receive raises during this period of

20   time?

21   A.      Yes.

22   Q.      How often did you receive raises?

23   A.      Yearly.

24   Q.      Is it your position that you should not have

```
 1    Q.      Do you know if it was the day after your

 2    meeting or two days after your meeting, do you

 3    have --

 4    A.      I don't --

 5    Q.      -- any recollection?

 6    A.      -- recall the exact date.

 7    Q.      Did you receive this message before the

 8    three-day suspension would have ended?

 9    A.      I believe I did.

10    Q.      What happened next?

11    A.      I see my doctor.

12    Q.      What doctor is that?

13    A.      Dr. Gilson.

14    Q.      Why did you see Dr. Gilson?

15    A.      Anxiety and chest pains.

16    Q.      Do you know what day you saw Dr. Gilson?

17    A.      I don't recall the exact day.

18    Q.      Was it after you received the voice mail

19    message from Patrick?

20    A.      Again, I don't recall the exact day.

21    Q.      I am not asking for the day.  I am asking

22    the sequence.  Do you remember if it was after that

23    message?

24    A.      Offhand, I don't recall.
```

1    records, to provide just a logical piece of the

2    narrative here.

3    BY MR. COLOMB:

4    Q.      Did Dr. Gilson do anything else in addition

5    to monitoring your heart and prescribing

6    medication?

7    A.      Told me to take it easy.

8    Q.      Did the doctor say anything with respect to

9    working?

10    A.      He gave me a doctor's note for work.

11            MR. COLOMB:  Mark that.

12            THE REPORTER:  Sure.

13            (Defendant's Exhibit No. 7 was marked for

14    identification.)

15    BY MR. COLOMB:

16    Q.      I have placed a document in front of you

17    that has been marked as Exhibit No. 7 and ask you if

18    you recognize it?

19    A.      Yes.

20    Q.      What do you recognize it to be?

21    A.      A doctor's note.

22    Q.      Do you recognize it as the doctor's note

23    from Dr. Gilson that you were just discussing?

24    A.      Yes.

1    Q.      Looking at the document, does that help you

2    to remember when you saw Dr. Gilson?

3    A.      It's got a date on it.

4    Q.      What is that date?

5    A.      February 27th.

6    Q.      Do you have reason to believe that

7    accurately reflects when you saw the doctor?

8    A.      It may.  That's what is here on the paper.

9    Q.      Do you have any reason to doubt that that

10   is an accurate statement of when you saw the

11   doctor?

12   A.      No.

13   Q.      Did Dr. Gilson do anything else for you

14   during this visit?

15   A.      Not that I can recall.

16   Q.      Based on this doctor's note, which indicates

17   you should not return -- "may not return to work

18   until March 13th," did you, in fact, do anything

19   with respect to working?

20   A.      Did I?

21   Q.      Yes.

22   A.      I don't recall.

23   Q.      Did you have any further contact with Pat

24   McKeown or anyone from Christy's?

1    A.    I don't recall offhand.

2    Q.    Do you know if you told Pat McKeown or

3    anyone from Christy's that you would be unable to

4    return to work until March 13th?

5    A.    This letter was sent to them.

6    Q.    How was the letter sent to them?

7    A.    This letter was FAXed to them.

8    Q.    Who FAXed it to them?

9    A.    I FAXed it.

10   Q.    When you say "them," did you FAX it to a

11   particular individual?

12   A.    I believe I called Patrick at home, and he

13   told me to FAX it.

14   Q.    Did you call Patrick on the same day you

15   received the note?

16   A.    Again, I don't recall.

17   Q.    Do you have any reason to believe you called

18   Patrick or FAXed the note any earlier than February

19   27th?

20   A.    I don't recall.

21   Q.    What did Patrick say to you during this

22   phone conversation, if anything?

23   A.    It was brief, and it was fine and, "Send the

24   letter, send it out."

1    A.    Every two to three weeks.

2    Q.    Every two to three weeks.  And how long had

3    that been happening?

4    A.    Since 2000.

5    Q.    Since 2000 -- well, from 2000 up until

6    February of 2002, had you ever missed work due to

7    any of these medical treatments or any medical

8    condition?

9    A.    I don't recall.

10   Q.    Prior to February of 2002, had you ever told

11   anyone at Christy's that you were receiving medical

12   treatment for depression or anxiety?

13   A.    I don't recall.

14   Q.    Well, I would like you to think for a moment

15   on that question, if you would?

16         Do you remember if you ever told Patrick

17   McKeown that you were receiving such treatment?

18   A.    I -- again, I don't recall.

19   Q.    Prior to February of 2002, had you ever

20   sought any leave time from Christy's?

21   A.    From what dates?

22   Q.    From 1998, when you started with Christy's

23   of Cape Cod, through February of 2002, had you ever

24   sought leave?

```
1     A.       I don't recall.

2     Q.       Do you recall if you ever actually took a

3     leave?

4     A.       I didn't take a leave.

5     Q.       Do you have any reason to believe you asked

6     for it, and it was denied?

7     A.       No.

8     Q.       Did you ask for any leaves from Christy's of

9     Cape Cod after February of 2002?

10    A.       I believe I did.

11    Q.       Do you know when?

12    A.       I don't recall the date.

13    Q.       Do you know why you asked for a leave?

14    A.       Medical.

15    Q.       What was your understanding of your

16    employment by the company as of the March 27th

17    meeting?

18    A.       I had no correspondence with.

19             THE REPORTER:  I'm sorry?

20             THE WITNESS:  I had no correspondence with

21    anybody from Christy's on it.

22    BY MR. COLOMB:

23    Q.       Did you, in fact, receive Exhibit No. 10 at

24    the meeting on March 27th?
```

1    that question?

2    A.    I don't know if I made a mistake, or -- I

3    just put "uncertain."

4    Q.    Prior to February 22nd when you met with Pat

5    McKeown for the first time, had Pat McKeown ever

6    told you that your performance at Christy's was

7    unsatisfactory?

8    A.    What dates again?

9    Q.    Any time before February 22nd, your first

10    meeting with Pat McKeown, had he ever told you that

11    your performance was unsatisfactory --

12    A.    No.

13    Q.    -- at Christy's?  Had anyone else at

14    Christy's prior to February 22nd ever told you that

15    your performance was unsatisfactory?

16    A.    No.

17    Q.    Prior to February 27th when you provided a

18    note from Dr. Gilson, had you ever told Patrick

19    McKeown that you were being treated for any

20    condition relating to anxiety, chest pain, stress,

21    bipolar disorder, or any of the other illnesses that

22    you have mentioned today?

23    A.    I don't recall.

24    Q.    Prior to February 27, 2002, had you ever

1    told anyone at Christy's Market other than Pat

2    McKeown that you were being treated for any of those

3    conditions?

4    A.      I don't recall.

5    Q.      Is there a reason why you don't recall?

6    A.      I don't recall that if I had spoke with

7    anybody.

8    Q.      Do you discuss this topic with individuals

9    other than family members and physicians?

10   A.      I don't recall.

11          MR. COLOMB:  That is probably a good

12   stopping point.  I want to look over the medical

13   stuff --

14          MR. SCOTT:  All right.

15          MR. COLOMB:  -- and wrap it up after we do

16   that.

17          For the record, we are going to suspend the

18   deposition at this point by agreement of the

19   parties.  We do have some additional medical

20   documentation that was provided fairly close in

21   time to the deposition, which the parties have

22   agreed the defense will have an opportunity to

23   review and come back with some additional questions

24   on that, rather than heading into that water