# TAB 7

```
 1                                Volume II
                                 Pages 1 to 73
 2                               Exhibits 5 to 14

 3               UNITED STATES DISTRICT COURT

 4               DISTRICT OF MASSACHUSETTS

 5   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
     MICHAEL J. WHALON,
 6                   Plaintiff(s),

 7        v.                           Civil Action
                                       No. 04-11939-JGD
 8   CHRISTY'S OF CAPE COD, LLC,
                     Defendant(s).
 9   _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

10

11        CONTINUED DEPOSITION OF PATRICK MCKEOWN, a witness

12   called by counsel for the Plaintiff, taken pursuant

13   to the applicable rules, before Diane L. McElwee,

14   Registered Merit Reporter and Notary Public in and

15   for the Commonwealth of Massachusetts, at the

16   LAW OFFICES OF DAVID O. SCOTT, P.C., 200 Chauncy

17   Street, Mansfield, Massachusetts, on Thursday,

18   February 2, 2006, commencing at 2:45 PM.

19

20

21                       _____

22             DIANE L. McELWEE, RPR, RMR
                    152 Seekonk Street
23             Norfolk, Massachusetts 02056
               Tel. and Fax -- 508-528-1055
24             e-mail -- dlmdepos@yahoo.com
```

1                    MR. COLOMB:  Same stipulations, and

2      we will keep numbering the exhibits in sequence.

3                    MR. SCOTT:  Let's see how far we

4      got.  I have four exhibits with subparts, a number of

5      subparts to Exhibit 4.  Let me grab the transcript to

6      verify all the exhibits are here.

7                    MR. COLOMB:  Okay.

8            (Pause)

9                    MR. SCOTT:  It looks to me like the

10     last exhibit was 4G2, which we do have 4G2.

11     Q     I know I wrote it down, but could you tell

12     me the correct pronunciation of your name?

13     A     McKeown.

14     Q     McKeown?

15     A     Close enough.

16     Q     I am going to show you a document and ask

17     you if you can identify it.  That was recently

18     furnished to me by your counsel.  I believe it

19     consists of four pages.

20     A     Yes, I do recognize it.

21     Q     What is that document?

22     A     It is a section of my Franklin planner that

23     I have.

24     Q     Is there a date on any of the pages?

1      A     There is February 22d, 2002; the 23d, 2002;

2   the 24th, 2002; and then basically a blank page

3   with --

4      Q     All those dates are in February?

5      A     Correct, 2002.

6                MR. SCOTT:  Why don't we get this

7   marked first.

8                (Exhibit 5 marked for identification)

9      Q     I am going to hand you back what's now been

10   marked as Exhibit 5.  That appears to be handwriting

11   of -- it appears to be a copy of an original document

12   with handwriting on it; is that correct?

13      A     Correct.

14      Q     And is that your handwriting on that

15   document?

16      A     Yes, it is.

17      Q     Are you the author of those four pages other

18   than the form itself, the handwritten parts?

19      A     Yes, I am.

20      Q     Do you have a recollection as to when you

21   created those -- I am going to call them notes if you

22   prefer.

23      A     Sure.

24      Q     What I am referring to is your handwritten

comments, whatever they may be.  Do you remember when you made those handwritten annotations?

A    Yes, I do.

Q    Were they made in the time period that's reflected on the dates of those documents, which I believe is the 22d to the 24th of February, or are they all made on one date?

A    They are all made on one date.

Q    What was the date they were made?

A    The 22d of February, 2002.

Q    I am going to ask you to do something that's a little bit tedious, but I have to because I tried to read those notes myself and I think I got about 80 percent.  So if I could ask you to read into the record those notes, I would appreciate it.

A    You want me to read the four pages?

Q    Please.

MR. COLOMB:  Can I maybe suggest we take a brief minute off the record so he can review it first so it will go more smoothly.

MR. SCOTT:  Absolutely.

(Discussion off the record)

A    Before I read this, can I explain to you the top two sections of this document?

1       Q    It's up to your counsel.

2                  MR. COLOMB:  I don't have a problem.

3    I suspect -- why don't you read it in and he can ask

4    you.

5       Q    I just wanted to get it in completely for

6    the record.

7       A    Okay.  So it's February 22, 2002.

8       Q    We are back on the record.

9       A    2:02 PM, Michael Whalon; one, Cash Problem,

10   608; two, Deposits at 608; three, Grand Totals at

11   608; four was Money Orders, 608; five, 610, Deposit

12   Shortage.

13                 5:20 PM, Brian Lipps, 401-258-0128;

14   one, Cement Block Construction; two, Year Built,

15   1974; three -- I think it's Sprinkler System; four,

16   Alarm Central; five, Security Camera.

17                 2:30 PM, Michael Whalon; one, Asked

18   about shrink problems, 607, 602, and 612; two, Asked

19   about manager 610, what was the plan; three, Asked

20   what was going on with 608 cash problem.

21                 One, No real answers, updates on shrink

22   issues; two, Planned to replace manager at 610

23   Monday, 25th of February with Tim Silverberg, was

24   training in store starting Monday, planned

1    replacement later in week; three, He said he

2    terminated two individuals who were the problem in

3    608, should be okay.

4                I asked him about the cash situation in

5    the store.  He said he thought it was corrected.

6                I asked him about a number of deposit

7    shortages.  He said he was not aware of any problems.

8    I asked him how the grand totals could --

9    February 23d page -- could be changed.  He said if

10   system crashed, it could be reset, but everything

11   would be set from there.  He asked why I was asking

12   him these questions.  I told him I was trying to find

13   out why we had these problems and cash shortages.  I

14   gave him copies of 2/13/02 Store 608 EOD report and

15   discrepancy between beginning and ending grand total.

16   He asked me where I got these reports and why I did

17   not give these reports to him.  I replied that I was

18   working on the issue.  He asked how he was supposed

19   to be responsible if the office did not provide the

20   reports to him.

21               I showed him 2/5/02 EOD report,

22   beginning reading increased by $1500, deposit shorted

23   by $1500 previously.  He asked me if I was accusing

24   him of stealing.  I am not a thief, he said.

1          I replied, I am trying to understand

2  who is doing this; I want answers.  I asked him if he

3  ever deposited bank deposits for Store 608.  He

4  replied that the manager asked him to drop off

5  deposits for her.  I stated that two deposits he

6  dropped off were short a total of $1500, deposit from

7  EOD summary 1/9/02 of 3,680 was short a thousand

8  dollars, 1/21/02 deposit of 2735.95 was short $500.

9  He stated that he has no access to the bag as it is

10  locked.  I asked him why he dropped it off at the

11  Hyannis rotary.  He said it was on his way down here.

12  He asked why he did not get a call from head office

13  on this.  I told him I got called.  I told him that

14  didn't he think it was strange these deposits he made

15  were short.  He said he did assemble the deposits; he

16  just dropped them off.  I asked him why he would put

17  himself in that position.  He said he was helping out

18  the manager.

19          Page 3, February 24th.  I proceeded to

20  show the EOD reports and copies of the deposits.  I

21  told him whoever did this changed the paperwork at

22  store level to reflect the new deposit amounts.  He

23  asked me where I got the sheets.  I replied from the

24  store.

 1              I then asked him about a money order
 2    for $500 on 10/29/01 -- was made out, Not Intended
 3    for Purpose -- looks like Dori, the system manager at
 4    610's signature, listed as miscellaneous paid out
 5    $500, said it was probably deposited by store.
 6    Sometimes it happens that way.  Asked him about a
 7    miscellaneous paid out for 576 on 1/14/02.  I told
 8    him Karen asked him about it, and he told her it was
 9    lottery paid out.  Paperwork was checked; no lottery
10    paid outs were supported by lottery detail.  I asked
11    him why he didn't follow up, and he said he forgot.
12    I replied that at the very least he failed to do his
13    job which first and foremost is to make sure the
14    money gets to the bank.

15              I asked him had he any problems.  He
16    said, I do not need money.  I have a second job that
17    pays 4 to $500 per week.  I just refinanced my house.
18    I am getting rid of one of the SUV's.  I asked him
19    about he and Dori Caussey, the assistant manager at
20    610.  He said he was married and nothing was
21    happening.  I asked him about bringing her to work
22    last week, and he said her car was broken and needed
23    a ride; what am I supposed to do.

24              I told him a deposit was short $400

1    over there.  He said it was called in.  I told him

2    the paperwork was changed.  He asked how did I know

3    that.  I replied that I had Bill Potter drop me off

4    his EOD report.  I told him the deposit was signed by

5    Dori.

6         Next page, "Activity 5, Mission

7    Statement" is the top of the page.  It's Michael

8    Whalon interview continued, page 4.

9         He replied about 610 that Bill was a

10   problem also.  He gave both of them until this week

11   to solve the problem, and then if they did not, he

12   would change management of Store 610.

13        He asked me where all this was going.

14   I replied that he failed to perform his job.  I

15   require the very basics of performance, getting sales

16   rung in and deposits to the bank.  I told him I was

17   inclined to terminate him.  I would recommend him as

18   a salesperson to Pine State.

19        He seemed shocked.  He said, After all

20   I have done for this company, coming in with no

21   experience, doing the computers, stores, 24 hours a

22   day on call.  I do not deserve this.  I replied that

23   I cannot live with these shortages.  He said we lived

24   with Peter Gorse (phon.) losing $40,000 in inventory,

1    Kenny losing excess dollars and we did not fire them.

2    Put me back in a store before this.

3                I told him that the manager of 608 has

4    an issue with these shortages and your deposits.  I

5    told him I got most of the reports from the store.

6                I thought briefly and told him I would

7    suspend him for three days for failing to perform his

8    duties in getting the cash to the bank.

9                We then -- we went back to the

10   paperwork -- I can't read the next word -- one of the

11   deposits again, and I told him he signed off on the

12   deposit being okay, but no slip was present.  He made

13   that deposit, but the bank acknowledgment was not

14   there.  He said it was in the store.  That was one of

15   the deposits that was short.

16               I told him that he was suspended until

17   Thursday; that I needed to talk with Christy.

18               Meeting concluded about 4:35 PM.

19   Q      Having just received this document today I

20   believe from your counsel, is there some reason why

21   this document was not produced earlier than today to

22   your knowledge?

23   A      No.

24   Q      Did you have possession of this document

1    since you became aware that there was litigation

2    ongoing between Mr. Whalon and Christy's of Cape Cod,

3    LLC?

4        A    It was in my planner.

5        Q    Was it a document that you simply forgot

6    about in your preparations with counsel for your

7    deposition and for our discovery in the case, meaning

8    the interrogatories and the request for production of

9    documents?

10       A    Yes.

11       Q    As you sit here today are there any other

12   documents that you are aware of that you might have

13   relating to Michael Whalon and specifically relating

14   to allegations of shortages around the time of

15   February 2002 and concerning his termination that you

16   have not produced?

17       A    Not that I am aware of.

18       Q    Who was the manager of Store 608 at the time

19   all this was going on?

20       A    Kristine DeCosta.

21       Q    Is this the manager I believe you testified

22   earlier that she had formed some opinions regarding

23   Mr. Whalon and his performance?

24                   MR. COLOMB:  Objection.  You can

1    answer that.

2         A    Correct.

3         Q    In evaluating the documentation regarding

4    these shortages, did you have documentation that you

5    referred to in these notes in your possession that

6    Mike Whalon would not have ordinarily been able to

7    obtain in the normal course of his performing his

8    duties?

9         A    Could you rephrase that?

10        Q    Sure.  Let me come at it a different way.

11             I am not sure I could find it if we

12    need to do so, but somewhere in the notes that you

13    have read into the record there is a comment to the

14    effect by Mr. Whalon, How am I supposed to know about

15    these things if I don't get the reports, or words to

16    that effect.  My question is were there reports that

17    you had in your investigation of these shortages that

18    he would not have ordinarily been privy to?

19             MR. COLOMB:  Objection.  You can

20    answer the question.

21        A    We would have to go through document by

22    document.  It's a very vague question.  The only one

23    that he would not have readily available would be the

24    deposit slips because that was from the bank.  That

1   shortages.

2        A    At the time of the meeting?

3        Q    Yes.

4        A    Not that I am aware of.

5        Q    Were these notes made contemporaneously with

6   the meeting, in other words, either during or

7   immediately after the meeting?

8        A    Right after 4:35.

9        Q    So you wrote these notes after Mr. Whalon

10  had departed from your presence after the meeting on

11  the 22d?

12       A    I would like to clarify that the top of page

13  one, which is the 22d, from 2:02 PM down to No. 5,

14  that was written before the meeting.

15       Q    Okay.

16       A    Next, Brian Lipps, the telephone number down

17  to No. 5, that was written before the meeting.

18       Q    Let me stop you there.  That segment of the

19  first page regarding Brian Lipps down to circled

20  No. 5, do any of those notes have anything to do with

21  Mr. Whalon?

22       A    No.  It was things I had to do that

23  afternoon that I wrote in advance.

24       Q    Then the next time entry is --

1      A    -- 2:30 PM, Mike Whalon.

2      Q    Then the balance of the four pages, the

3    handwritten portion, deals with Mike Whalon, correct?

4      A    Correct.  That was written after the

5    meeting.

6      Q    Now at any point in Mr. Whalon's employment

7    did you become aware that he had any mental or

8    physical health issues?

9      A    Physical issues.

10     Q    What were the issues that you became aware

11   of?

12     A    He had an ankle problem and I believe a jaw

13   problem.

14     Q    Were you ever made aware prior to his

15   termination of any mental health issues?

16     A    No.

17     Q    Did you ever receive any fax similes from

18   any health care providers regarding any mental health

19   care issues regarding Michael Whalon?

20     A    Prior to his termination?

21     Q    Prior to his termination.

22     A    And after this meeting on the 22d?

23     Q    Why don't we say prior to his termination at

24   any time.

```
 1        A     I did receive a doctor's note faxed to me.

 2        Q     Do you remember when that was?

 3        A     The 27th of February.  It was dated the 27th

 4   of February 2002.  I received it the following day.

 5        Q     Do you recall the substance of that note?

 6                    MR. COLOMB:  Objection.

 7                    You can answer that question.

 8        A     It was a doctor's note stating Michael could

 9   not work for a period of time due to anxiety I

10   believe.

11        Q     What, if anything, did you do after you

12   received that note regarding Mr. Whalon or his

13   employment?

14        A     Placed it in his file, called my attorney.

15        Q     Did you ever have any discussions with

16   Mr. Whalon personally about any of his mental health

17   issues?

18                    MR. COLOMB:  Objection.  You can

19   answer that.

20        A     Could you be more specific?

21        Q     Did you ever discuss with Mr. Whalon the

22   note that you just testified that you received from a

23   physician?

24        A     No.
```

 1    did you relate the entries on page 5 to when you

 2    received this whole packet?

 3        A    Store 608.

 4        Q    But there is nothing on page 5 that tells us

 5    it's Store 608, correct?

 6                MR. COLOMB:  Objection.  You can

 7    answer that.

 8        Q    Is there anything on page 5 that would tell

 9    you that these entries relate to Store 608?

10        A    There could be, but I do not know the

11    terminal number for the lottery by heart.

12        Q    I am asking you what you know.  Would you

13    know looking at --

14        A    Not at that number, no.

15        Q    Let me show you a document and ask you if

16    you can identify it.

17        A    Yes.

18        Q    Is that the note that you stated you saw

19    which first indicated to you that Mr. Whalon had any

20    type of mental health issue?

21                MR. COLOMB:  Objection.  You can

22    answer.

23        A    Yes.

24        Q    And do you know whether that document was

 1    received on the 27th by your office?

 2        A    I first saw it on the 28th.

 3        Q    Okay.  Was it sent by fax simile, if you

 4    recall?

 5        A    I believe it was.

 6        Q    At that point what was Mr. Whalon's

 7    employment status with Christy's on the 27th of

 8    February, 2002?

 9        A    Suspension.

10        Q    I may have asked this, and I apologize if I

11    am being redundant.  I didn't see it in my notes.

12    Did you ever accuse Mr. Whalon of having an affair

13    with Dori Caussey?

14        A    Can you rephrase that?

15        Q    Sure.

16             Did you ever indicate to Mr. Whalon

17    that you had formed an opinion that he was

18    romantically or sexually involved with Dori Caussey?

19        A    No.

20        Q    Did you ever make any remarks to Mr. Whalon

21    regarding his relationship with Dori Caussey other

22    than his relationship of one employee of Christy's of

23    Cape Cod, LLC, to another?

24             MR. COLOMB:  Objection.  You can

1    answer it.

2        A    Very ambiguous question.

3        Q    I will try to rephrase it.

4             Did you ever discuss with Mr. Whalon

5    any relationship of any type that he may have had

6    with Dori Caussey outside of the normal and customary

7    interaction that he would have as an employee of

8    Christy's?

9        A    I asked him the relationship between he and

10   Dori Caussey.

11       Q    Why did you feel the need to ask him about

12   that relationship?

13       A    Based on the investigation I concluded there

14   was some issues between Stores 608 and 610, and she

15   operated both stores.

16       Q    Ms. DeCosta was the supervisor of Store 608?

17       A    She was the store manager.

18       Q    Of 608 at this relevant time of February,

19   March 2002?

20       A    Correct.

21       Q    Who was the manager of Store 610 during this

22   same time period?

23       A    There was no store manager at that time.

24       Q    Who had operational responsibility for the

1    store?

2         A    Operational responsibility?

3         Q    Right.

4         A    Michael Whalon did and also the two

5    assistant managers at that location.

6         Q    One was Dori Caussey?

7         A    Correct.

8         Q    And who was the other?

9         A    Bill Potter.

10        Q    Other than Mr. Whalon and Chris Downey, did

11   you speak with any other persons -- strike that.

12             Did you speak with any other employees

13   of Christy's -- when I say "Christy's" I mean

14   Christy's of Cape Cod, LLC -- regarding the shortages

15   and discrepancies in Store 608 or Store 610 in the

16   February -- let's say January, February timeframe of

17   2002?

18        A    Yes.

19        Q    And who else did you have conversations

20   with?

21        A    Kristine DeCosta.

22        Q    Anyone else?

23        A    Bill Potter.

24        Q    Can you describe the conversation you had

1    with Bill Potter or conversations stating what you

2    said to him and what he said to you as best as you

3    can recall?

4        A    I asked for reports on certain days from

5    Bill Potter.

6        Q    Did he provide those reports to you?

7        A    Yes, he did.

8        Q    And what reports did he give to you in terms

9    of the type of documentation?

10       A    Store sales report.

11       Q    Anything else?

12       A    Deposit slips.

13       Q    Anything else that you recall?

14       A    Not that I recall.

15       Q    Did Mr. Potter have any explanation

16   regarding any shortages or financial discrepancies in

17   the store he was the assistant manager of during that

18   timeframe?

19       A    Not that I recall.

20       Q    Would it be the store manager, the assistant

21   store manager's primary responsibilities to account

22   for store funds, both receipts and disbursements?

23                MR. COLOMB:  Objection.  You can

24   answer that.

```
 1      A     Which store are we talking about?

 2      Q     Any store.

 3      A     It's the supervisor, the manager, assistant

 4   manager's responsibility.

 5      Q     Mr. Whalon had supervisory responsibility

 6   for more than one store, correct?

 7      A     Correct.

 8      Q     The manager and assistant manager generally

 9   stay at the store they are assigned to, correct?

10      A     Correct.

11      Q     Isn't it the position of the supervisor

12   or -- I am sorry -- manager or assistant manager to

13   account for receipts, make out deposit slips, and

14   account for cash-out?

15                 MR. COLOMB:  Objection.  You can

16   answer that.

17      A     You have asked me three different questions.

18   You have asked me the supervisor, manager, and

19   assistant manager.  Do you mean the manager and

20   assistant manager?

21      Q     Yes.

22      A     It's the manager and assistant manager, when

23   the manager is not there, to count the cash and make

24   the deposits.
```

1    Q    By the way, did you take any disciplinary

2    action against any of the assistant managers or

3    managers to either Store 608 or 610 regarding these

4    discrepancies in those stores, suspend them,

5    discipline them in any way, terminate them?

6    A    Regarding these matters?

7    Q    Yes.

8    A    No.

9    Q    Wouldn't they also, as well as Michael

10   Whalon, have responsibility for the financial

11   accounting of those stores?

12   A    Yes.

13   Q    Wouldn't they be the employees in the best

14   position to account for store funds?

15              MR. COLOMB:  Objection.

16              You can answer that.

17   A    Fairly ambiguous question.

18   Q    What is the financial responsibility of a

19   manager, assistant manager of a store?

20   A    Ensure the sales get rung up and cash gets

21   to the bank.

22   Q    And that all money is accounted for,

23   correct?

24   A    Correct.

```
 1      Q    And that wasn't done in these stores,

 2    correct?

 3                 MR. COLOMB:  Objection.  You can

 4    answer.

 5      Q    At least it was your opinion that this was

 6    not done in these stores, 610 and 608, during the

 7    January, February 2002 time period?

 8                 MR. COLOMB:  Objection.  You can

 9    answer.

10      A    Correct.

11      Q    So why didn't you discipline the managers?

12      A    It's ultimately the responsibility of the

13    supervisor to discipline managers.

14      Q    You first brought these matters to

15    Mr. Whalon's attention on what date?

16      A    22d of February 2002.

17      Q    I would like to show you a document which

18    has been previously marked as Exhibit 3A.  Do you

19    remember that document?

20      A    Yes, I do.

21      Q    And is that a performance action suspending

22    Mr. Whalon?

23      A    Yes, it is.

24      Q    So if you brought -- I am sorry.  Strike
```

```
 1   that.

 2               What was the date of the initiation of

 3   the suspension?

 4        A     The commencement of the suspension?

 5        Q     Right.

 6        A     The 25th.

 7        Q     What day was the 22d, do you recall?

 8        A     Friday.

 9        Q     You notified him on the 22d that he is

10   suspended, correct?

11        A     Effective the 25th, correct.

12        Q     So if you first brought these matters to his

13   attention on the 22d, suspended him effectively the

14   25th, how was he supposed to conduct an investigation

15   or discipline the store managers?

16               MR. COLOMB:  Objection.  You can

17   answer.

18        A     He had opportunity before that to

19   investigate a number of these issues.  He failed to

20   do so.

21        Q     But you didn't bring it to his attention

22   until the 22d, correct?

23        A     On a number of these issues?  On the 22d.

24        Q     Let me show you another document and ask you
```

```
 1   if you have seen it before.

 2              MR. SCOTT:   I am sorry.   Before you

 3   answer, I don't remember if we marked one of these or

 4   not.   I am referring to the copy of a document

 5   entitled, Bethel Medical Group, dated February 27,

 6   2002.

 7              MR. COLOMB:   I don't think you did.

 8              MR. SCOTT:   I don't think we did.

 9   Let's mark that.

10        (Exhibit 7 marked for identification)

11   Q    Have you ever seen the document which I

12   placed before you?

13   A    I have.

14   Q    Could you identify that document, please?

15   A    It's from the Charis Counseling Center.

16   It's a doctor's note regarding Michael would be out

17   of work due to an extreme anxiety, panic attacks,

18   severe depression, returning April 1, 2002.

19   Q    Was that document faxed to your office?

20   A    I believe it was.

21              MR. SCOTT:   I will have that marked.

22        (Exhibit 8 marked for identification)

23   Q    What, if anything, it you do regarding

24   Michael Whalon after receipt of the document that's
```

```
 1    now been marked as Exhibit 8?
 2         A    It was placed in his personnel file and I
 3    spoke to my attorney.
 4         Q    I show you another document and ask you if
 5    you can identify it.  Is that a letter you sent to
 6    Mr. Whalon dated March 4, 2002?
 7         A    Correct.
 8                   MR. SCOTT:  Let me mark this.  For
 9    the record, it consists of two pages.
10              (Exhibit 9 marked for identification)
11         Q    Do you see in the second paragraph, first
12    sentence, says, At this time we have further reviewed
13    the facts?
14         A    Correct.
15         Q    What, if anything, did you do to further
16    review the facts of Mr. Whalon's case between your
17    meeting of February 22d and the sending of this
18    letter, which has now been marked as Exhibit 9?
19         A    I went over the paperwork that I think you
20    have listed in the documents here, and I reviewed
21    some of the issues Mike discussed at our meeting.
22         Q    Do you have any opinion based on facts as to
23    whether or not shortages are customary regarding
24    these various stores?
```

```
 1                    MR. COLOMB:   Objection.   You can
 2     answer that.
 3          A     What do you mean by "customary"?
 4          Q     Have they ever occurred before?
 5          A     Shortages occur all the time.   That's the
 6     nature of our business.
 7          Q     Why do you say that?
 8          A     Dealing with cash there is going to be
 9     shortages.
10          Q     What was there about this situation that
11     drew your attention to it and to Mr. Whalon as a
12     supervisor?
13          A     Highly irregular changes of grand totals and
14     documentation.
15          Q     Had you ever in the past during Mr. Whalon's
16     employment discussed with him his handling or
17     investigation of shortages or disciplining of store
18     managers regarding shortages?
19          A     Yes.
20          Q     What was different about this situation from
21     the prior occasions, if anything?
22          A     There was a manipulation of the system.
23          Q     By whom?
24          A     I don't know.
```

1     Q    Mr. Whalon would not have been the only

2   person with the capability to manipulate the system,

3   correct?

4                  MR. COLOMB:  Objection.  You can

5   answer.

6     A    I don't know that.

7     Q    You don't know who would be capable of

8   manipulating the system based on their position with

9   the company?

10    A    You might want to break that question into

11  two parts.

12    Q    First of all, what system are you talking

13  about?

14    A    Talking about the sales reports and the

15  grand totals and adjusting figures.

16    Q    Any other documents or systems?

17    A    Changing deposits.

18    Q    Any other systems?

19    A    Not that I remember right now.

20    Q    Who within the organization would then have

21  the capability to affect or change the data regarding

22  those systems?

23    A    You would have to break that down.

24    Q    Who would have the ability or capability

1    within Christy's to change sales reports?

2       A    Somebody who is familiar with the system

3    from both the office and the store.

4       Q    Could it be affected at the store level?

5       A    In some circumstances it could be.

6       Q    By the manager or assistant manager?

7       A    Could be.

8       Q    What about the grand totals?  Who would have

9    the capability to affect those?

10      A    Somebody who has a very good knowledge of

11   the system.

12      Q    Could that be done at the store level?

13      A    Could be.

14      Q    What about the deposits?

15      A    Could be.

16              MR. COLOMB:  Objection.  I am not

17   sure what the question is.

18      Q    It's the same question.  Who would have the

19   capability to affect the deposits?

20      A    Manager, assistant manager, supervisor.

21      Q    As a result of your investigation did you

22   form an opinion regarding whether or not Mr. Whalon

23   was personally involved in the misappropriation of

24   funds from Christy's?

1      A    No.

2      Q    Did you form an opinion as to whether any of

3   the store managers or assistant managers were

4   involved in the misappropriation of funds from

5   Christy's?

6      A    No.

7      Q    After the period of January through

8   March 2002, did Christy's change any of its systems

9   or procedures to better account for shortages in the

10  future?

11                MR. COLOMB:  Objection.  You can

12  answer that.

13     A    That's ever evolving as new technology comes

14  to the market.

15     Q    Were any significance changes made to the

16  existing technology after March of 2002?

17                MR. COLOMB:  Objection.  You can

18  answer.

19     A    To date?

20     Q    Yes.

21     A    Yes.

22     Q    When did those significant changes occur?

23                MR. COLOMB:  Objection.  You can

24  answer.

1    A    It decreased.

2    Q    Did shortages still occur from time to time?

3    A    It's a retail business.  Yes, they do.

4    Q    Has anyone since Michael Whalon's

5    termination been disciplined or terminated for

6    accounting, financial accounting for shortages?

7              MR. COLOMB:  Objection.  You can

8    answer that.

9    A    I am not sure I understand that question.

10   Q    I will rephrase it.

11             Has any other employee after Michael

12   Whalon's termination been disciplined, which could be

13   suspended or other discipline, or terminated for that

14   employee's failure to perform financial accounting

15   practices regarding shortages?

16             MR. COLOMB:  Objection.  You can

17   answer that.

18   A    Yes.

19   Q    What was the position of the person or

20   persons who were so disciplined or terminated?

21             MR. COLOMB:  Objection.  You can

22   answer.

23   A    I would have to go down through each

24   position and notify you.

1      Q    Were they store managers to your knowledge?

2                 MR. COLOMB:  Objection.  You can

3      answer.

4      A    There were some.

5      Q    Mr. Whalon, was his position replaced by

6      someone else after his termination?

7      A    Not immediately.

8      Q    Is someone performing the same or similar

9      functions to what he performed when he was employed

10     at the present time?

11     A    There is.

12     Q    And who is that person?

13     A    Ken Camille, C A M I L L E.

14     Q    When was Mr. Camille hired?

15     A    Could you rephrase the question?

16     Q    When was Mr. Camille hired?

17                MR. COLOMB:  I want to note a

18     continuing objection to the questions.

19                Go ahead and answer.

20     A    Ken Camille has worked for us I believe

21     since the company was founded.

22     Q    When did he assume responsibilities that

23     were similar or the same as Mr. Whalon's?

24     A    2005.  I believe it was June.

```
 1      Q    Does he hold a present title at the company?
 2      A    Yes, he does.
 3      Q    What is that title?
 4      A    I believe it's marketing counselor, slash,
 5   supervisor.
 6      Q    Let me show you another document and ask you
 7   if you can identify it.
 8           (Pause)
 9      Q    Have you seen that before?
10      A    Yes.
11      Q    Is that your handwriting on that document?
12      A    Correct.
13      Q    What is that document?
14      A    It's a performance notice to Michael Whalon
15   and termination.
16      Q    Are you able to tell from that document when
17   Mr. Whalon was terminated?
18      A    3/27/2002.
19               MR. SCOTT:   Why don't we get that
20   marked.
21           (Exhibit 10 marked for identification)
22      Q    Who made the decision to terminate
23   Mr. Whalon?
24      A    I did.
```

```
 1      Q     Did you consult with anyone regarding your

 2   decision to terminate him?

 3                   MR. COLOMB:  Objection to the extent

 4   that that's inquiring about counsel.

 5      Q     Excluding legal counsel.  Thank you.

 6      A     The owner of the company, Christy Mihos.

 7      Q     At the top of the page of Exhibit 10 do you

 8   see something called the Date of Notice, top

 9   right-hand corner?

10      A     Yes.

11      Q     And what date is in that block?

12      A     Two-twenty -- looks like five.

13      Q     '02?

14      A     2002.

15      Q     Was this document ever given to Mr. Whalon?

16      A     Yes.

17      Q     When was it given to him, if you recall?

18      A     I believe 3/27/02.

19      Q     Did he come to the company offices at that

20   time?

21      A     Yes, he did.

22      Q     Had you made the decision to terminate him

23   before he arrived at the meeting?

24      A     Yes.
```

```
 1      Q    Do you remember when you made the decision
 2   to terminate him?
 3      A    February 22d, between that and February 27th
 4   I believe.
 5      Q    Within a week of the meeting that you have
 6   the four pages of notes on you made a decision to
 7   terminate him; is that correct?
 8      A    Correct.
 9      Q    I show you another document and ask you if
10   you have seen that before.
11           Have you seen that before?
12      A    Yes.
13      Q    Is it correct that that letter has three
14   pages to it?
15      A    That's correct.
16           MR. COLOMB:  I will stipulate the
17   exhibit has three pages to it.
18      Q    Would you like some more water?
19      A    Yes.
20           MR. SCOTT:  We will mark that.
21           (Exhibit 11 marked for identification)
22      Q    I place before you what had a now been
23   marked as Exhibit 11.  Is it correct this is a letter
24   from Michael Whalon to Christy's directed to your
```

1      Q      And what is the document?

2      A      It's a note from the Charis Counseling

3    Center regarding Michael Whalon dated the 21st of

4    March 2002.

5                    MR. COLOMB:  Off the record.

6              (Discussion off the record)

7              (Record read)

8      Q      Had you ever seen that before today?

9      A      Yes.

10     Q      Was it faxed to your office?

11     A      I received it at my office.

12                   MR. SCOTT:  That should be 12.

13             (Exhibit 12 marked for identification)

14     Q      Let me show you another document and ask you

15   if you have seen it before today.

16     A      Yes, I have.

17     Q      Would you identify the document, please.

18     A      It's a letter from Michael Whalon to my

19   attention.

20     Q      Do you recall receiving it on or about

21   April 9, 2002?

22     A      Around then or after, yes.

23                   MR. SCOTT:  Let's mark that.

24             (Exhibit 13 marked for identification)

1     cards that would go with a certified mail receipt.  I

2     think what Mr. McKeown is questioning is that the

3     dates on those receipts are from March of 2002, prior

4     to the April letter.

5                     MR. SCOTT:  Okay.  Can we agree

6     those documents speak for themselves as to what they

7     are?  They may very well --

8                     MR. COLOMB:  They may or may not be

9     related.

10                    MR. SCOTT:  Okay.

11    Q     I show you another document and ask you if

12    you can identify it.

13    A     It's a document dated 3/27/02; time,

14    2:35 PM, and it looks like a synopsis of a meeting

15    that Mike and I and Jim Gilhooley had at our head

16    office.

17    Q     Was that the meeting where Mr. Whalon was

18    notified that he was terminated?

19    A     Correct.

20    Q     Is that your handwriting on this document?

21    A     No.

22    Q     Do you know who created this document?

23    A     I believe it was Jim Gilhooley.  I did not

24    see this until you produced it through court, you

1    know, through the lawyer.

2        Q    What was Jim Gilhooley's position?

3        A    Controller.

4        Q    Was anyone else at the meeting on March 27,

5    2002?

6        A    Besides the three of us?

7        Q    Correct.

8        A    No.

9        Q    Was his first name Jim?

10       A    G I L H O O L E Y.  I believe that's

11   correct.

12       Q    Did you direct Mr. Gilhooley to make notes

13   at the meeting?

14       A    I did.

15       Q    But you didn't see those notes until

16   litigation?

17       A    I don't believe I did.  I saw I believe a

18   typed version of them.

19       Q    Was the typed version of these notes

20   something that you produced in connection with this

21   litigation?

22       A    I believe so.

23       Q    Do you know whether the typed version of

24   these notes has been entered as an exhibit in any

1    depositions that you have attended?

2        A    I don't.

3                    MR. COLOMB:  Off the record?

4                    MR. SCOTT:  Sure.

5            (Discussion off the record)

6                    MR. SCOTT:  Give me a minute with

7    Mr. Whalon and we will wrap up.

8            (Short recess taken)

9                    MR. SCOTT:  I have no further

10   questions.  I will defer to Attorney Colomb if he

11   would like to inquire.

12                   MR. COLOMB:  I have a few follow-up

13   questions.

14

15                   CROSS EXAMINATION

16   BY MR. COLOMB:

17       Q    Could you explain briefly the process

18   whereby a deposit slip goes from the bank to the home

19   office in the accounting procedures for stores?

20       A    The deposit slip?

21       Q    Yes.

22       A    It doesn't go from the store to the head

23   office or from the bank to the head office.  It goes

24   from -- it goes back to the store manager or

1    weekly basis?

2        A    Deposit receipt.

3        Q    Which is by the bank reflecting the amount

4    deposited?

5        A    That is correct.

6        Q    Okay.  Thanks.

7            Looking to Exhibit No. 5, which is your

8    handwritten notes, all I want to clarify for the

9    record is the order in which the items were written

10   down by you.  There is a first grouping which is

11   2:02 PM, five numbered items.  Do you see that at the

12   very top of the page?

13       A    Yes.

14       Q    When was that to your knowledge?

15       A    2:02 PM on the 22d of February, 2002.

16       Q    Okay.  Was that prior to meeting with

17   Mr. Whalon?

18       A    Yes.

19       Q    Underneath that you have five numbered items

20   relating to a gentleman named Brian Lipps?

21       A    Brian Lipps.

22       Q    When was that, if you know, written on the

23   sheet of paper relative to the other writing on the

24   paper?

1    A    The Brian Lipps, the telephone number, and

2    the five points were written after the top points.

3    They were written right after that.  The 5:20 was

4    written in at 5:20 when I called him.  I just had a

5    record of what time I called him.

6    Q    Did you make the Brian Lipps entry prior to

7    meeting with Mike Whalon?

8    A    Yes.

9    Q    And after meeting with Mike Whalon did you

10    then go back and place 5:20 PM next to the Brian

11    Lipps entry?

12    A    Yes.

13    Q    Why did you do that?

14    A    Because I wanted a record of the time I

15    actually talked to Brian Lipps.

16    Q    You wrote down one through five in advance

17    of speaking to Brian Lipps?

18    A    Yes.

19    Q    Okay.

20            Can you tell me what a lottery payout

21    report is?

22    A    The actual report or what a paid out is.

23    Q    I want to know what the report is.  What is

24    a lottery paid out report as you have used that term

1      A     Yes.

2      Q     What, if anything, would you expect

3   Mr. Whalon to have taken note of in reviewing page 4?

4                    MR. SCOTT:   Objection.

5      A     The miscellaneous paid out for 576 on

6   1/14/02 should have been reviewed, checked for

7   authenticity, and if no documentation was found,

8   further review.

9      Q     Okay.   What kind of documentation are you

10  referring to?

11     A     There should have been either a vendor form

12  if it was a paid out for a vendor, which that's what

13  miscellaneous paid out is.   It's not a lottery paid

14  out.   There should have been backup detail to that,

15  and if he reviewed this form, he should have also

16  reviewed line 170 and 240 because that's been

17  adjusted by 576.

18     Q     What is the significance of that to you?

19     A     Someone is trying to cover up a shortage.

20     Q     During your testimony you were asked to

21  identify individuals that you spoke to during the

22  course of your investigation of the cash shortages

23  involving Store 608 in the period approximately

24  January through March of -- actually strike that.

1          You were asked to identify individuals

2    that you had spoken to concerning cash shortages at

3    Store 608 and Store 610 covering the periods from the

4    fall of 2001 into January and February of 2002.  Do

5    you remember testifying about that?

6         A    I do.

7         Q    Did you identify for us all of the

8    individuals that you spoke to?

9         A    I identified I believe two individuals at

10   store level.

11        Q    Were there other individuals that you spoke

12   to?

13        A    Yes.

14        Q    Who were those individuals?

15        A    They would have been office personnel.  I

16   believe Chris Downey.

17        Q    And what was Chris Downey's position?

18        A    Controller.

19        Q    Why did you speak to Chris Downey, if you

20   recall?

21        A    I needed some reports.

22        Q    Okay.  Anyone else that you spoke to?

23        A    I spoke to I believe Karen.

24        Q    Who is Karen?

```
1      A     Karen Gifford is accounts payable.

2      Q     Why did you speak to Karen?

3      A     Question of the lottery paid out.

4      Q     Is that the lottery paid out reflected on

5   Exhibit No. 6?

6      A     Yes.

7      Q     I place that back in front of you.

8      A     Yes.

9      Q     Did you speak to anyone else?

10     A     I might have spoken to Christy.  I am not

11  sure.

12     Q     By "Christy" do you mean Mr. Mihos?

13     A     Yes.

14     Q     Anyone else?

15     A     Not that I recall.

16              MR. COLOMB:  I am all set.

17              MR. SCOTT:  Okay.  Thank you.  We

18  will conclude.

19          (Discussion off the record)

20              CROSS EXAMINATION, continued

21  BY MR. COLOMB:

22     Q     Mr. McKeown, I have placed Exhibit 5 in

23  front of you.  As you sit here today, in January or

24  February of 2006 reviewing Exhibit 5, were you aware
```