**TAB 19**

1

<pre>
Volume:  I
Pages:  1 - 127
Exhibits:  11
</pre>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.:  04-11939-JGD

MICHAEL J. WHALON,                    )
    Plaintiff,                        )
                                      )
v.                                    )
                                      )
CHRISTY'S OF CAPE COD, LLC,           )
    Defendant.                        )

DEPOSITION of **ANNE R. KRONENBERG, RNCS**, a witness

called on behalf of the Defendant, taken pursuant to

the applicable provisions of the Massachusetts Rules

of Civil procedure, before John F. Kielty, a Notary

Public in and for the Commonwealth of Massachusetts,

at the offices of Bethel Medical Group, 111 Torrey

Street, Brockton, Massachusetts, on Friday, May 12,

2006, commencing at 11:14 a.m.

**JOHN F. KIELTY**
**2 Garrett Place**
**Plymouth, Massachusetts 02360**
**(508) 759-6767**

1    A.       We have a signed contract.

2    Q.       And at any given time, do you have one

3    supervising physician?

4    A.       Yes.

5    Q.       So your supervisor is your supervisor and is

6    not necessarily connected to the patients?

7    A.       Oh, absolutely not.

8    Q.       And your supervising physician wouldn't

9    necessarily be a treating physician for a patient

10   that you saw?

11   A.       No.

12   Q.       If I could, maybe we could just stipulate

13   for the record to make this as brief as possible,

14   but is it your recollection that you first engaged

15   in treatment with Michael Whalon in the year 2000?

16   A.       Yes.

17   Q.       And you hadn't been treating him prior to

18   the year 2000?

19   A.       No.

20   Q.       Starting in the year 2000 and coming to the

21   present, can you tell us your work history, where

22   you were working from 2000 to the present?

23   A.       Oh, where --

24   Q.       Yes.

1   biweekly.

2   Q.      If we could, looking at the first visit on

3   10/1, did you complete -- it appears -- is there a

4   date on Exhibit No. 2?

5   A.      October 12th.  That would be the second

6   visit.

7   Q.      And that matches up with the second visit.

8   Looking at your first visit on October 1st, it

9   appears to me that you made multiple notations

10  regarding OCD?

11  A.      Yes.

12  Q.      Did you have any questions or reach any

13  conclusions about obsessive-compulsive disorder with

14  Mr. Whalon?

15  A.      No, it's a definite fact.

16  Q.      How did you determine that to be a definite

17  fact?

18  A.      He and I agreed on that because he spent

19  many hours cleaning his kitchen.  It had to be

20  spotless.  He would go down and clean it first thing

21  in the morning, all the counters, the floors.  He

22  would do it the last thing before he went to bed,

23  the counters, floors, and he couldn't tolerate

24  anything being out of order in his house.  Uh-huh.

1    Q.       -- that you know of?  Does it have any

2    effect to bipolar disorder that you --

3    A.       No.

4    Q.       -- know of?  You also have a notation,

5    "ADHD - all signs - Dr. Rudin."  Could you tell us

6    what that means, please?

7    A.       "ADHD" is attention -- adult attention

8    disorder, hyperactivity disorder.  It's a -- it's a

9    mental health problem that everyone's aware of

10   today, ADHD.  It means that -- the major part of it

11   is inability to focus, procrastination, inability to

12   organize your activities.  Those are the basics.

13           And I referred him to Dr. Rudin to do a

14   psychoneurology test for him, and Dr. Rudin did not

15   think he was ADHD.  He thought he was OCD, and that

16   he had generalized anxiety disorder, which is

17   "GSAD."  And that if he continued to show signs of

18   ADHD, that he could be retested.

19   Q.       And so the record is clear, you are reading

20   from Dr. Rudin's report?

21   A.       I am.

22   Q.       Which is Exhibit No. --

23           THE REPORTER:  One.

24           MR. COLOMB:  One.

1    A.      I have to tell you, I doubt if it -- Dr.

2    Rudin is not that quick with his records, so but it

3    does say that on the FAX.

4    Q.      So looking at the period of your intake of

5    Mr. Whalon through the outside evaluation by Dr.

6    Rudin, at this point in treating Mr. Whalon,

7    approximately eight visits, I guess, did you draw

8    any conclusions?

9    A.      Well, my hypothetical conclusion was he was

10   extremely depressed, that he had PTSD, that he had

11   generalized -- myself, generalized extreme anxiety,

12   and that he was extremely OCD.  OCD is a form of

13   anxiety, too.

14   Q.      And do you have as you are here today or

15   based on the notes that we have just reviewed, do

16   you have any recollection about any discussion that

17   you had with Mr. Whalon regarding his employment?

18   A.      Yes.

19   Q.      What do you recall in terms --

20   A.      He enjoyed --

21   Q.      -- of your discussions?

22   A.      -- working for Christy's.

23   Q.      Did you discuss with Mr. Whalon the

24   interaction between any of the conditions that you

1    just mentioned and his employment, if there was

2    any?

3    A.       I think probably we discussed -- probably

4    discussed his anxiety, his generalized anxiety.  He

5    was anxious driving.  He had to drive quite a

6    distance but nothing pertaining to the actual work

7    situation.

8    Q.       Did Mr. Whalon tell you if he had discussed

9    any of these medical and psychiatric conditions that

10   we have been talking about with any of his

11   co-workers?

12   A.       I don't -- I can't remember, but I would --

13   just knowing him, he's quite a private person.

14           MR. COLOMB:  Why don't we pause for just a

15   moment?  Let me look at the records and try to

16   expedite this.

17           (Discussion off the record.)

18           MR. COLOMB:  We will go back on.

19   BY MR. COLOMB:

20   Q.       Ms. Kronenberg, I am going to ask you to

21   look at Exhibit No. 3 again, which are your

22   treatment records.  And again, just for purposes of

23   trying to be respectful of everybody's schedule

24   today, I just want to highlight a couple of things

1              And I believe -- why don't we just have all

2      parties and the deponent if my statement has been

3      accurate signify your agreement to that?

4              MR. COLOMB:  Your statement is accurate.

5              THE WITNESS:  Yes.

6              MR. SCOTT:  Thank you.

7              MR. COLOMB:  Could we go off the record for

8      one more second?

9              MR. SCOTT:  Sure.

10             (Discussion off the record.)

11     BY MR. COLOMB:

12     Q.      Ms. Kronenberg, if I could direct your

13     attention to the entry for May 3, 2001, there you

14     make reference to panic attacks --

15     A.      Yes.

16     Q.      -- four years ago, X four months --

17     A.      Yes.

18     Q.      -- went away, then April another.  Do you

19     have any recollection as to what that note

20     reflects?

21     A.      Yes, it's my shorthand that he had panic

22     attacks prior to seeing me for four -- which was

23     four years ago, and he had them for four months.

24     And then they went away, and then this past April,

1    he had another.  And he went to Dr. Gilson.  He put

2    him on Xanax, which is antianxiety medication, and

3    then he had a --

4    Q.      Yes, there is a comment.  Your next word

5    there is "police experience."  And I would ask, if

6    you know, if you can tell us what that refers to?

7    A.      He was on the Cape for Christy's, and he

8    didn't have his seat belt on.  I guess he was

9    putting it on, and a cop pulled him over.  And he

10   got really angry, and Mike needs to be right, so he

11   resented that.

12   Q.      To your recollection, was there anything

13   other than a simple seat belt violation involved in

14   that --

15   A.      No.

16   Q.      -- encounter?

17   A.      No.

18   Q.      And you have a notation about Dr. Hooberman?

19   A.      Yeah.

20   Q.      Who is Dr. Hooberman?

21   A.      He's a bipolar doctor, also.  I'm trying to

22   get him a med consult.

23   Q.      And to your knowledge, did Mr. Whalon, ever

24   see --

1    A.       No, he didn't.

2    Q.       -- Dr. Hooberman?

3    A.       No, only because Dr. Hooberman was totally

4    booked.

5    Q.       You have an entry for 9/27/2001, session 8.

6    It looks like it fills two blocks.  Would you agree

7    with that, that it is a two-block entry?

8    A.       Can we find one following that?

9    Q.       Sure.

10           MR. COLOMB:  Why don't we go off the record

11   for a second?

12           (Discussion off the record.)

13           MR. COLOMB:  Back on.

14   BY MR. COLOMB:

15   Q.       Directing your attention, Ms. Kronenberg,

16   there is an entry dated 9/27 marked session 8.

17   Underneath that, there is another block which does

18   not have a date or session number but does have --

19   A.       Uh-huh.  (Indicates affirmatively).

20   Q.       -- comments.  We were speculating whether it

21   was a continuation of the 9/27 notes --

22   A.       Okay.

23   Q.       -- or perhaps, is a different session.  That

24   is not significant to my question.  You have a

1    statement there, "No to bipolar questions."

2    A.      Yes.

3    Q.      Can you tell us what that means?

4    A.      It means that if there's any possible

5    suspicion that I might have about a client, whether

6    they're depressed or have a bipolar ingredient,

7    there is a standard bipolar test, and it was

8    negative for bipolar.

9    Q.      And can you briefly describe to us what the

10   test is?

11   A.      It asks if there are times when you speak

12   more rapidly, and you are more social.  It's a 12-

13   or 14-question paper.

14   Q.      Okay.

15   A.      I can get you a copy.  I have it in my

16   office.

17           Do you -- are you more sexually needy?  Do

18   you do impulsive things, like, calling people in the

19   middle of the night?  Do you go without sleep

20   several nights in a row without feeling tired?

21   Q.      So these are examples of the questions

22   that --

23   A.      Yes.

24   Q.      -- are asked?

64

```
1      A.      Those are examples.

2      Q.      Are they yes or no questions?

3      A.      Yes.

4      Q.      And you --

5      A.      And his was totally negative.

6      Q.      And so you would ask the patient to answer

7      yes or no to the various --

8      A.      Uh-huh.  (Indicates affirmatively).

9      Q.      -- questions?

10     A.      Yes.

11     Q.      And based on those answers, you would reach

12     some conclusion?

13     A.      Yes, I would.

14     Q.      And for Mr. Whalon, as of this particular

15     point, you reached the conclusion that it was no to

16     the bipolar questions?

17     A.      Uh-huh.  (Indicates affirmatively).

18     Q.      Proceeding ahead to the next session, 11/29,

19     session number 9, --

20     A.      Uh-huh.  (Indicates affirmatively).

21     Q.      -- again, I just want to see that I am

22     noting your handwriting correctly.  Is it correct

23     that on the middle of the page at the bottom it had

24     the block, it has, question bipolar?
```

1    your treatment, in other words, can you recall any

2    conversations you had with Mr. Whalon regarding his

3    employment?

4    A.      At that time?

5    Q.      Yes.

6    A.      Up to 1/18?

7    Q.      Yes.

8    A.      Well, I have stated right here in 1/18 that

9    he enjoyed his work.

10   Q.      Did Mr. Whalon express any issues to you,

11   that you can recall, regarding difficulty in

12   performing his work?

13   A.      No.

14   Q.      Did he indicate to you that any of the

15   anxiety or any of the other conditions that we have

16   talked about so far today impacted his ability to

17   work?

18   A.      No.

19   Q.      Let me just change course for a minute here.

20   During the course of treating Mr. Whalon, did you

21   communicate with any other providers other than Dr.

22   Rudin, who you have identified?

23   A.      Dr. Rakita.

24   Q.      Dr. Rakita.  Did you communicate with any

1    Q.        -- with all the --

2    A.        -- ask you if I --

3    Q.        -- people you see years ago.

4    A.        -- had a document that I had seen him on

5    3/6, and here it is.

6    Q.        What is this document?

7    A.        This is a document that I wrote on March 6,

8    2002, that Mike was out of work due to extreme

9    anxiety, panic attacks, and severe depression, and

10   that he will return to work April 1, '02.  And then

11   on this paper, I wrote that he -- as I said, that he

12   needs the doctor's excuse from work.

13   Q.        So do you now believe that you saw him on

14   March 6, --

15   A.        Yes, I do.

16   Q.        -- 2002?  Why did you write the note, which

17   is marked as Exhibit No. --

18           MR. COLOMB:  Six.

19           THE REPORTER:  Five.

20   BY MR. COLOMB:

21   Q.        Exhibit No. 5, why did you write that note?

22   A.        I don't know what you mean.

23   Q.        Did you write the note that you are holding

24   in your hand as --

1       A.      Yes.

2       Q.      Why did you write it?

3       A.      Because he was -- it was an office visit.

4       Q.      Did you have an expectation as to what Mr.

5       Whalon was going to do with the note?

6       A.      That's an interesting -- I don't remember,

7       but I could assume that I wrote it so he would not

8       have to go to work.

9       Q.      Did Mr. Whalon --

10      A.      No.

11      Q.      -- ask you to write the note?

12      A.      I can't remember.  How long ago was that,

13      four years ago?  I don't remember.

14      Q.      Again, I am not trying to be difficult.  I

15      am just trying to understand what you recall.

16      A.      No, I can't answer that.

17      Q.      Do you have any --

18      A.      I'm going -- I'm going to volunteer that if

19      I think a client is so upset he can't work, I will

20      suggest that he not go to work, and I will write a

21      note, yeah, of my own accord.

22      Q.      Either aided by the documents you have in

23      front of you or from your memory, do you have any

24      recollection of Mr. Whalon's condition on March 6,

1    2002?

2    A.    I believe I wrote on the prior visit that he

3    was extremely anxious.  He is extremely depressed.

4    That he was evidencing mood swings.  He was tearful.

5    He was angry.  He was overreactive, and he had some

6    hyperarousal, which would refer to prior

7    hyperarousal for his prior harmful events in his

8    life of any kind.

9    Q.    And that entry that you were just reading is

10   dated 2/28?

11   A.    Yes.

12   Q.    And I --

13   A.    And you can see I referred him to Dr.

14   Rakita.

15   Q.    Okay.

16   A.    For a bipolar assessment.

17   Q.    And again, I think we covered this.  The

18   2/28 entry does not make reference to employment.

19   Do you recall discussing employment with Mr. Whalon

20   on February 28, 2002?

21   A.    I don't recall that.

22   Q.    And do you recall discussing employment with

23   Mr. Whalon on March 6, 2002?

24   A.    No, I don't.

1    A.       He went to his office with letters.  I don't

2    know what those -- can't remember what they were,

3    but he was extremely anxious and was -- I wrote that

4    I felt he was very courageous to do that.

5    Q.       Okay.

6    A.       And another disability for work is evidently

7    given.

8            MR. COLOMB:  I would like to ask Mr. Kielty

9    to mark a document, if you could wait just one

10   second?

11           (Defendant's Exhibit No. 6 was marked for

12   identification.)

13   BY MR. COLOMB:

14   Q.       So showing --

15   A.       So when I say another disability for work

16   given, it probably does refer to this.

17   Q.       And when you say "this," are you referring

18   to Exhibit No. 6, which I just placed in front of

19   you?

20   A.       Yes.

21   Q.       Does Exhibit No. 6 indicate any medical

22   condition or diagnosis of Mr. Whalon?

23   A.       No.

24   Q.       And would you agree that it says, "Please

1    excuse Mike Whalon from work until May 4th"?

2    A.        Yes, it does.

3    Q.        Why did you write that note?

4    A.        He was having flashbacks.  I do know that he

5    had -- he was being evaluated.  His job was being

6    evaluated at that time, and that he was feeling --

7    he was feeling very anxious about it because he did

8    like working for Christy's.  He liked his boss,

9    whose, I think, name was Patrick.  I don't think

10   it's written in here.  And he felt really at the

11   time betrayed by Patrick, and that made him feel all

12   these symptoms that he was having.  And he was

13   somewhat suicidal for a while.

14            Change that.  He had some suicidal ideation,

15   and that he decided -- he denied that he was

16   suicidal, but he was very, very anxious.  (Witness

17   indicating.)

18   Q.        Did Mr. Whalon indicate to you on March 21st

19   that he felt betrayed by Patrick?

20   A.        I can't remember what day he told me, but it

21   was a continuous feeling of being betrayed and not

22   believed.

23   Q.        Is it possible that you learned this after

24   March 21st?

1    absolutely no thinking that Mike was bipolar until

2    the Christy episode.

3    Q.    Okay.

4    A.    And I want to just -- one of the reasons

5    that -- and I don't know what day he told me this.

6    I don't know how many times he told me this.  I

7    can't possibly answer that, but I know that he was

8    totally -- felt, as I said before, betrayed because

9    he is an honest man.  And he felt falsely accused as

10   taking money, and it's made him totally paranoid.

11   And he cannot work in any store where he has to

12   touch the cash flow, and he's tried.  And it's not

13   been possible, and that accusation has just --

14   really has changed his life.

15   Q.    If I can ask you a few follow-up questions,

16   first of all, did you ever ask Mr. Whalon to keep a

17   journal?

18   A.    I can't answer that.

19   Q.    How do you know or what is the basis for

20   your statement that Mr. Whalon is an honest man?

21   A.    Say that again?

22   Q.    What is the basis for your statement that

23   Mr. Whalon is an honest man?

24   A.    The last word?

1    Q.       -- debilitating mentally?

2    A.       Physically.

3    Q.       Physically?

4    A.       Yeah.

5    Q.       Have you had any other conversations about

6    that lawsuit with Mr. Whalon?

7    A.       No.

8    Q.       Now, we have discussed a wide variety

9    obviously of treatment and conditions today.  Is it

10   your position that Mr. Whalon suffers from bipolar

11   disorder?

12   A.       It is.

13   Q.       And what do you believe is the cause of Mr.

14   Whalon's bipolar disorder?

15   A.       I think the trauma of feeling betrayed by

16   being fired from Christy's and falsely accused.

17   Q.       And what is the basis for that opinion?

18   A.       I don't think he was bipolar before, and a

19   traumatic event can cause that.

20   Q.       Now, apart from the conversation you

21   indicated earlier with your supervisor, are you

22   aware of any other scientific support for traumatic

23   events in one's environment --

24   A.       Yeah.

106

```
1      Q.        -- causing bipolar disorder?

2      A.        Yeah.

3      Q.        Can you elaborate on that?

4      A.        Well, my own son.  My own son was

5      traumatized in a Mexican jail and falsely accused.

6      Q.        And you believe that caused him to suffer --

7      A.        Well, he never had --

8      Q.        -- bipolar disorder?

9      A.        -- it before.

10     Q.        Are you aware of any other mental health

11     condition -- before I even ask you that question,

12     what I am trying to do here is summarize your

13     perspective of Mr. Whalon's condition.  In addition

14     to what you have stated about bipolar disorder, is

15     it your opinion that Mr. Whalon suffers from any

16     other mental health conditions?

17     A.        Yes.

18     Q.        Can you --

19     A.        He has panic attacks.  He has very strong

20     general anxiety, very acute general anxiety, which

21     comes and goes according to his moods.

22     Q.        Other conditions?

23     A.        Well, he still has OCD.

24     Q.        Do you believe that he suffers from
```

```
 1        attention deficit disorder?

 2        A.      I'm not sure.  I'm not sure.

 3        Q.      Do you think that is possible?

 4        A.      You know, I don't know, because attention

 5        deficit disorder is kind of a nebulous thing.

 6        Q.      How about posttraumatic stress disorder?

 7        A.      Yes.

 8        Q.      Mr. Whalon suffers from that?

 9        A.      Uh-huh.  (Indicates affirmatively).

10        Q.      Are there any other conditions that Mr.

11        Whalon suffers from?

12        A.      I can't think of any right now.

13        Q.      Do you believe that Mr. Whalon suffered from

14        panic disorder prior to his employment with

15        Christy's?

16        A.      Yes, I do.

17        Q.      And do you believe he suffered from general

18        anxiety --

19        A.      Yes, I do.

20        Q.      -- prior to his employment with Christy's?

21        Posttraumatic stress disorder --

22        A.      Yes.

23        Q.      -- prior to his employment with Christy's?

24        A.      Yes.
```

1          THE REPORTER:  I'm sorry.  Miss, could you

2     please wait for him to finish his question, please?

3     BY MR. COLOMB:

4     Q.      And do you believe the -- he needs you to

5     wait for me to finish before agreeing, --

6     A.      Okay.

7     Q.      -- so he can get it down.

8     A.      I'm sorry.

9     Q.      I'm sorry as well.  We are getting close to

10    the end here.  Do you believe that he suffered from

11    obsessive-compulsive disorder prior to his

12    employment with Christy's?

13    A.      Yes.

14    Q.      Did Mr. Whalon ever tell you that he told

15    anyone at Christy's Market he suffered from any of

16    these mental health conditions prior to his

17    termination?

18    A.      Can't answer that.  I don't know.

19    Q.      You have discussed, and we have now your

20    records for psychotherapy counseling that you

21    provided to Mr. Whalon.  We have also discussed

22    medications that you recommended for Mr. Whalon.

23    And I gather, although we didn't ask this, you

24    ultimately prescribed medications directly for Mr.

1    go up and down, have extreme periods of agitation

2    when he can't function, and then hopefully, he'll

3    be stable for a period of time.   (Witness

4    indicating.)

5    Q.      And is that type of movement characteristic

6    of bipolar --

7    A.      Yes.

8    Q.      -- disorder?   In your counseling of Mr.

9    Whalon, has he indicated to you whether he has

10   discussed his mental health condition with

11   individuals other than physicians?

12   A.      I don't think so.

13          MR. COLOMB:   I am going to ask Mr. Kielty to

14   mark our last document.

15          (Defendant's Exhibit No. 10 was marked for

16   identification.)

17   BY MR. COLOMB:

18   Q.      I am going to ask you if you recognize this

19   document, which has been marked as Exhibit 10?

20   A.      I do.

21   Q.      And it appears to be a letter that you

22   wrote; is that correct?

23   A.      Yes.

24   Q.      And is it dated September 12th?

1    A.    Yes.

2    Q.    And did you write the letter on September

3    12, 2002?

4    A.    Well, that's when it was typed.

5    Q.    I'm sorry.  I don't mean to be that --

6    would you agree that on or about close to September

7    12th --

8    A.    Uh-huh.  (Indicates affirmatively).

9    Q.    -- you composed the letter?

10   A.    Yes.

11   Q.    And is your signature on the letter?

12   A.    Yes.

13   Q.    And the letter is addressed to Mr. Whalon's

14   attorney?

15   A.    Yes, it is.

16   Q.    How did you come to write this letter?

17   A.    Because Mike had hired an -- had hired Mr.

18   Scott as an attorney because he felt he had a case

19   against Christy's.

20   Q.    I would direct your attention to the third

21   paragraph, which begins "However," and I would just

22   ask you to read that paragraph to yourself for a

23   moment?

24   A.    I did just now.